[Cite as *Insa v. Insa*, 2016-Ohio-7425.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| MICHAL INSA | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 26909 |
| | : | |
| v. | : | Trial Court Case No. 2015-DV-446 |
| | : | |
| MAHAMADOU INSA | : | (Appeal from Domestic Relations |
| | : | Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 21st day of October, 2016.

. . . . . . . . . .

JADE K. SMARDA, Atty. Reg. No. 0085460, 110 North Main Street, Suite 1600, Dayton, Ohio 45402
     Attorney for Plaintiff-Appellant

MAHAMADOU INSA, 4138 Pompton Court, Dayton, Ohio 45405
     Defendant-Appellee-Pro Se

. . . . . . . . . . . .

HALL, J.

{¶ 1} Michal Folley Insa appeals from the trial court's judgment entry overruling her objections to a magistrate's decision, vacating an ex parte temporary protection order

against her estranged husband, appellee Mahamadou Insa, and dismissing her petition for a full domestic violence civil protection order.[1]

{¶ 2} Michal advances four assignments of error. First, she contends the trial court erred in declining to conduct an in camera interview of the parties' minor child, who was a protected person under the ex parte order. Second, she claims the trial court erred in refusing to reopen the proceedings, after a hearing on her petition, to address newly discovered evidence related to potential abduction of the child. Third, she asserts that the trial court erred in dismissing her petition and vacating the ex parte order because its decision is against the weight of the evidence. Fourth, she maintains that the trial court erred in overruling her objections to its adoption of the magistrate's decision based on her non-compliance with Civ.R. 53, which was inapplicable.

{¶ 3} The record reflects that Michal filed her petition for a domestic violence civil protection order in April 2015, seeking protection for herself and the parties' minor child, who was four years old. The pro se petition alleged the following acts of domestic violence committed by Mahamadou:

Pushing when pregnant, threatening to hit, pushing when at the [marital] residence[,] refusing to let either receive help for food [or] medicine[.]

---

[1] We note that Michal Insa died on August 12, 2015 before this appeal was instituted. (Doc. #25, Suggestion of Death). On February 19, 2016, we sustained a motion to substitute Michal's adult daughter, Tamieka Boyd, as appellant on behalf of Michal's minor child, who was a protected person under the ex parte order and on whose behalf Michal had sought a full domestic violence civil protection order. For purposes of clarity, however, we will continue to refer to Michal in our analysis despite the formal substitution of Boyd. To avoid confusion, we also will refer to Michal and Mahamadou Insa by their first names.

Forcing his 2-4 yr old daughter to have sex with him by kissing her and using his finger in his [sic] vagina atil [sic] screaming crying for the pain that was cause. Slapping her at times[.]

Threatening to cause me harm by hotting [sic] me. Spit on me in the pas[t].

(Doc. #1 at 2).

{¶ 4} After granting an ex parte temporary order protecting Michal and the child, a magistrate held a two-day hearing in June and July 2015. The witnesses at the hearing were Michal, psychologist Antoinette Cordell, Detective Elizabeth Alley, and Mahamadou. For her part, Michal testified that she and Mahamadou had married in 2003 but were estranged. She proceeded to recount allegations of sexual abuse committed by Mahamadou against their child. She explained that the allegations came to light in late January 2015 when she observed the child playing with a toy bear and a doll in a sexual manner. (Tr. Vol. I at 12). The activity included the child taking her finger and "strok[ing] between the baby doll's legs." (*Id.* at 137). According to Michal, the child stated that "Baba" (the child's name for Mahamadou) had been doing that to her. (*Id.* at 138). When questioned further, the child mentioned an incident at a mosque. (*Id.*).

{¶ 5} Michal testified that she previously had suspected sexual abuse involving the minor child. In particular, she mentioned an incident that occurred around December 2012 when the child was two years old. On that occasion, Mahamadou inadvertently "pocket dialed" Michal's phone. When she answered the phone, she heard the child singing in the background. She then heard the child start screaming. According to Michal, the

screaming continued for about 10 minutes. (*Id.* at 14-15). When she later questioned Mahamadou about the incident, he told her to change the child's diaper. (*Id.* at 17). Upon doing so, she saw what appeared to be light blood. (*Id.*). It was "very faint" and a "pinkish color." (*Id.* at 127). She also occasionally noticed discharges in the child's panties. Michal brought the issue to the attention of a doctor, who treated the discharges with an antibiotic. (*Id.* at 18). Michal also mentioned having taken the child to the hospital in 2012 "with concerns of an unusual rash." (*Id.* at 19). At that time, the child was examined by the Columbus Children's Medical Center staff and her concerns were "dismissed." (*Id.* at 141). The emergency room staff did not perceive the rash as a problem. (*Id.* at 142).

{¶ 6} With regard to the January 2015 incident involving the toy bear, the doll, and the child's related disclosures, Michal contacted the police and Care House of Dayton. She also scheduled a vaginal examination at Children's Medical Center in early February, 2015. (*Id.* at 18, 21, 36). Michal testified that she heard her daughter tell a detective that Mahamadou had touched her "twah," which was the child's name for her "private area." (*Id.* at 24-25). On the day of the vaginal exam, Michal spoke with Officer Alley, who, according to Michal, questioned whether she had mental problems that may have triggered the sexual-abuse complaint. (*Id.* at 40). At that point, Michal feared her unspecified "past" may have been clouding the officer's opinion with regard to the truth of the allegations. (*Id.* at 41). The child underwent a medical examination that neither confirmed nor ruled out the existence of sexual abuse. (*Id.* at 43-44).

{¶ 7} Michal also testified about an incident that occurred shortly before the hearing when the child accused Mahamadou of having taken nude pictures of her. (*Id.* at 61-63). According to Michal, the child recalled that the pictures had been taken in her

room when she was two years old. (*Id.* at 62-63). The only picture introduced at the hearing, however, was benign and depicted the child's face and body from approximately the armpits up. (Hearing Exh. 9).

{¶ 8} Michal additionally testified that Mahamadou, who was from Niger, West Africa, previously had expressed an interest in taking the child to live in Africa because he believed the schools were better there. (*Id.* at 79). Michal expressed her own fear that Mahamadou might take the child to Africa, continue to engage in sexual abuse, and ultimately kill the child. (*Id.* at 81-82).

{¶ 9} On cross examination, Michal acknowledged having a prior felony record for aggravated assault. (*Id.* at 95). She also admitted having reported being kidnapped and saved by a farmer when she was 13 years old. (*Id.* at 97). When questioned about the assertions in her petition, Michal clarified that her allegation of Mahamadou engaging in "sex" with the child meant "fondling." (*Id.* at 98-99).

{¶ 10} With regard to the petition's allegations of physical abuse against her, Michal acknowledged that they had occurred relatively long ago. In particular, she stated that the alleged "pushing" was mostly mutual and had occurred at least five years earlier when she was pregnant. (*Id.* at 118). The threats mentioned in the petition had occurred in 2013 and 2014. (*Id.* at 120). As for the denial of food or medicine, Michal recalled incidents when Mahamadou had believed the child did not need to go to the doctor and when he had questioned her about her blood-pressure medicine. (*Id.* at 122-123). Michal also mentioned one incident about a year earlier when Mahamadou had slapped the child. (*Id.* at 133). She acknowledged that the slap was "not hard." (*Id.* at 133). She also recalled one incident the previous year when Mahamadou had spit on her. (*Id.* at 134).

{¶ 11} The next witness was psychologist Cordell, who was called by Michal's counsel. Cordell stated that she had been seeing the child since April 2015. (Tr. Vol. II at 17). The sessions stemmed from Michal's concerns about the child's emotional behavior, which included crying, screaming, refusing to eat, hitting her head, having nightmares, and other things. (*Id.* at 18). Cordell testified that Michal had informed her of the child's sexual-abuse allegations. But her role was not "to investigate that or to figure out exactly what may or may not have happened." (*Id.* at 19). She did not conduct a sexual-abuse investigation. (*Id.* at 37-38).

{¶ 12} In one of Cordell's early sessions, the child reported that she did not want to see her dad or live with him. (*Id.* at 26). When asked whether her father had hurt her, the child responded "yes" but did not elaborate. (*Id.*). In a later session, the child reported that her father had taken pictures of her with her clothes off. (*Id.* at 28). In none of Cordell's sessions did the child ever mention Mahamadou inappropriately touching her anywhere. (*Id.* at 48). Cordell did not get the impression that the child was trying to remember something that she had been coached to say. (*Id.* at 30). But she also never inquired whether Michal had mentioned anything to her about her father. (*Id.* at 40). According to Cordell, the child met the criteria for post-traumatic stress disorder. (*Id.* at 31).

{¶ 13} The next witness was Detective Alley, who was called by Mahamadou's counsel. Alley testified that she worked in the Special Victims Unit at the CARE House. (*Id.* at 75). As part of her investigation, Alley spoke with Michal and the child about the sexual-abuse allegations. As soon as she began the rapport-building portion of the child's interview, the child immediately said without being prompted or questioned that "Baba

touched my twah." (*Id.* at 80). Alley found this spontaneous statement to be unusual and acknowledged that it raised "some concern." (*Id.* at 80-81). The child provided few details but described the touching as having occurred twice—once in a mosque and once in Mahamadou's truck. (*Id.* at 81, 87). On at least one of the two occasions, the child recalled that he had touched her "twah" with a magnifying glass. (*Id.* at 88). The child provided no other information, however, about what he had done with the magnifying glass. (*Id.*).

**{¶ 14}** Alley subsequently spoke to Mahamadou, who was cooperative. (*Id.* at 83). He surrendered his cell phone and agreed to take a polygraph test, although no test ever was administered. (*Id.* at 84). Alley described Michal as "very aggressive in wanting charges to go forward[.]" (*Id.* at 85). Alley presented the results of her investigation to the prosecutor's office, and "charges were refused." (*Id.* at 86, 99).

**{¶ 15}** On cross examination, Alley testified that she thought Michal's behavior during the course of the investigation was out of the ordinary:

> * * * [S]he was wanting immediate answers the whole time. Showed up at the CARE House multiple times, was bringing pictures of allegedly her being naked and always calling with other concerns, things that happened being addressed earlier, things that had come up including, oh, I remember a magnifying glass being involved, I remember a magnifying glass in the house.
>
> Things that were just coming up as she thought about them that she was always showing up at the CARE House for. That is unusual.

(*Id.* at 100).

**{¶ 16}** With regard to the alleged nude photos, Alley stated:

* * * And actually [Michal] told me that [Mahamadou] had multiple pictures on his phone that were inappropriate and she brought one to the CARE House and said she was not able to get the other ones and when I reviewed his phone, I found the exact same picture that she brought to me and it was not an inappropriate picture. It was a picture of his child.

(*Id.* at 104).

{¶ 17} Alley stated that Michal identified the picture at issue (Exhibit 9) as one of the objectionable "naked" photos she had found on Mahamadou's phone. (*Id.* at 110). Alley further testified that Montgomery County Children Services (MCCS) had started an investigation as a result of Michal's sexual-abuse allegations. That investigation resulted in MCCS finding the allegations "unsubstantiated." (*Id.* at 109). According to Alley, she found "lots of inconsistencies in the story along the entire investigation." (*Id.* at 114). They included "inconsistencies with Michal's story, the inconsistencies in the forensic interview and the inconsistencies in speaking with her children." (*Id.* at 114-115).

{¶ 18} For his part, Mahamadou testified and described his marriage to Michal as "troubled." (*Id.* at 122). He denied touching his daughter's vaginal area or looking at it with a "microscope." (*Id.* at 128). He theorized that Michal may have fabricated her allegations against him because she was "angry" at him. (*Id.*). With regard to the picture admitted into evidence, he testified that he took it while watching television with the child, who was wearing panties and was "not naked." (*Id.* at 129). He also denied pushing Michal, threatening her, depriving her of food or medicine, slapping the child, or spitting on Michal. (*Id.* at 132-133).

{¶ 19} On cross examination, Mahamadou initially denied ever being alone with

his daughter. (*Id.* at 136). He then acknowledged being alone with her one time. (*Id.* at 136-137). He proceeded to describe an incident where he and the child were sleeping in the house while Michal went to the store. (*Id.*). He stated that was the only time he had been "in the house alone" with the child. (*Id.*). When questioned about taking the child to the mosque, Mahamadou explained that he and the child had not been alone in the house before going there because Michal had been home. (*Id.* at 139). He admitted that he had been alone with his daughter in his truck. (*Id.* at 140).

{¶ 20} Following the hearing, Michal's counsel filed an August 26, 2015 suggestion of death, indicating that Michal had died on August 12, 2015. (Doc. #25). The suggestion of death included a motion under Civ.R. 59(A)(8) for a hearing to address new evidence of imminent harm to the child. In support, the motion referenced an attached affidavit from Michal's adult son, Matthew Downs. He averred that he had met with Mahamadou to discuss his mother's death certificate. During the meeting, Mahamadou requested his laptop and the child's passport. (Doc. #25, Downs affidavit at ¶7). Downs did not turn over the passport, but the request caused him to fear that Mahamadou might obtain the passport, or a duplicate, and flee to Africa with the child. (*Id.* at ¶ 7-9).

{¶ 21} One day after counsel filed the suggestion of death and the Civ.R. 59 motion, the magistrate filed a decision dismissing the petition on the merits and vacating the ex parte order. (Doc. #26). The decision included findings of fact that are consistent with, but more abbreviated than, those set forth above and also consistent with the hearing testimony. The magistrate found that Mahamadou had "testified credibly" and that he had "credibly denied all of Michal's allegations of abuse." (*Id.* at 3). As for conclusions of law, the magistrate stated:

The evidence presented by Michal to support the allegations of abuse are statements made by the 4 year old to Michal and others. These statements lack detail and in one instance, related an inability of the child to describe the alleged abuse by Mahamadou. Michal's allegations have been investigated by law enforcement and CSB. Despite the allegations, no charges or action has been taken. It is found that Michal has failed to prove by the preponderance of the evidence that Mahamadou has committed domestic violence.

(*Id.*).

**{¶ 22}** Thereafter, on September 14, 2015, the trial court filed a judgment entry adopting the magistrate's decision. (Doc. #27). Therein, the trial court noted that no objections to the magistrate's decision had been filed under Civ.R. 53(D)(3)(b). The trial court found no error of law or defect on the face of the magistrate's decision. It also entered its own judgment vacating the ex parte order and dismissing Michal's petition for a domestic violence civil protection order. (*Id.* at 2).

**{¶ 23}** Fourteen days later, on September 28, 2015, Michal's counsel filed objections to the trial court's adoption of the magistrate's decision. (Doc. #28). In those objections, counsel explained that Civ.R. 53(D)(3)(d) did not apply to domestic violence civil protection order proceedings, which were governed by Civ.R. 65.1. Under that rule, counsel noted that the proper procedure was to file objections within 14 days after the trial court's adoption of the magistrate's decision. *See* Civ.R. 65.1(F)(3)(d)(i). Because the trial court adopted the magistrate's decision on September 14, 2015, counsel argued

that the September 28, 2015 objections were timely. Counsel proceeded to advance three objections: (1) challenging the magistrate's denial of a motion to conduct an in camera interview of the child, (2) alleging error in the magistrate's implicit denial of the Crim.R. 59 motion to address newly discovered evidence, and the (3) asserting that the "credible" evidence did not support the magistrate's ruling. (Doc. #28). In conjunction with the objections, Michal's counsel filed a praecipe for a hearing transcript and sought an extension of time to file the transcript. (Doc. #29, 30).

{¶ 24} On October 22, 2015, the trial court granted an extension of time until November 7, 2015 for the transcript to be filed. (Doc. #30). But four days later, on October 26, 2015, the trial court overruled the objections to its adoption of the magistrate's decision without addressing them, asserting that (1) there had been no request for findings of fact or conclusions of law, (2) a transcript had not been ordered, and (3) the objections were untimely under Civ.R. 53. (Doc. #31). This appeal followed.

{¶ 25} As a means of analysis, we turn first to Michal's fourth assignment of error, which challenges the trial court's overruling of her objections. We find Michal's argument on this issue persuasive. Contrary to the trial court's assertions, a transcript of the hearing before the magistrate had been ordered and the trial court itself had just granted an extension of time for it to be filed. With regard to the trial court's statement about no findings of fact or conclusions of law being requested, the magistrate's decision that the trial court adopted already contained explicit "findings of fact and conclusion of law." Finally, with regard to the trial court's concerns about non-compliance with Civ.R. 53, Michal's objections clearly and correctly pointed out that Civ.R. 53 did not apply and that the objections were governed by Civ.R. 65.1.

**{¶ 26}** Under Civ.R. 65.1(F)(3)(d)(i), a party has 14 days to file written objections to a trial court's adoption of a magistrate's denial of a protection order. "Notably, unlike Civ.R. 53, a party may not object to the magistrate's grant or denial of a protection order under Civ.R. 65.1." *Heimann v. Heekin*, 1st Dist. Hamilton No. C-130613, 2014-Ohio-4276, ¶ 7. Here the trial court adopted the magistrate's denial of a protection order on September 14, 2015. The trial court's entry adopting the magistrate's decision was directly appealable at that point. *See* Civ.R. 65.1(G). Alternatively, Civ.R. 65.1(F)(3)(d)(i) gave Michal the option to file objections within 14 days of the trial court's adoption of the magistrate's decision. That is what occurred here. The objections were timely filed on September 28, 2015.[2] As a result, the trial court erred in overruling them as untimely under Civ.R. 53.

**{¶ 27}** Ordinarily we would remand a case for the trial court to properly apply the appropriate rule and render a corrected decision. However, in the unique circumstances of this appeal we decline to do so for several reasons. Civ.R. 65.1, unlike Civ.R. 53, does not provide for a request for findings of fact and conclusions of law (*see* Civ.R. 53(D)(3)(a)(ii)), suggesting a more streamlined proceeding for protection orders. Under Civ.R. 65.1 the trial court may adopt the magistrate's denial or grant of a protection order "upon review of the order and a determination that there is no error of law or other defect evident on the face of the order." Civ.R. 53 allows the court to "hear a previously-referred matter, take additional evidence, or return a matter to a magistrate," Civ.R. 53(D)(4)(b),

---

[2] We note that the timely filing of objections stayed the time for appeal until after the trial court ruled on them. *See* Civ.R. 65.1(G). Civ.R. 65.1 objections do not stay the trial court's order. Therefore, Michal's present appeal was timely as well.

and it requires the trial court to undertake "an independent review as to the objected matters." Civ.R. 53(D)(4)(d). Each of those options is absent from Civ.R. 65.1, which indicates that court action includes only "adoption, modification, or rejection," of a magistrate's decision, Civ.R. 65.1(F)(3)(c)(iv), and no standard of review is designated.[3] Here, the trial court determined "[t]he court further finds there is no error in law, or defect on the face of the Magistrate Decision." (Doc. #27). We also observe that two of the assignments of error, whether the magistrate was required to interview the child and whether failure to grant the Civ.R. 59 motion constitutes an abuse of discretion are legal questions. The trial court would be in no better or worse position than are we to decide those issues. Similarly, regarding the third assignment, suggesting that the magistrate decision is against the weight of the evidence, if the trial court is unable to hear evidence itself, then it is subject to drawing conclusions only from review of the same transcript and record that we have before us. Finally, the trial court's entry of judgment against Michal constituted an appealable order, whether or not objections were filed. Civ.R. 65.1(G). Therefore, we proceed to address the remaining assignments of error, which raise precisely the same issues raised in the objections. Based on our determination *infra* that the remaining three assignments of error all lack merit, the trial court's overruling of the objections as untimely constituted harmless error. Accordingly, the fourth assignment of error is overruled.

{¶ 28} In her first assignment of error, Michal contends the trial court erred in declining to conduct an in camera interview of the parties' child, who was a protected

---

[3] We indicate only what the rules contain and do not determine whether or not a court may have inherent authority to take additional evidence or return a matter to a magistrate upon objection under Civ.R. 65.1.

person under the ex parte order. Michal initially raised this issue in a June 3, 2015 motion. (Doc. #17). She then raised it again during the evidentiary hearing. (Tr. Vol. I at 170). Finally, she raised the issue in her unsuccessful objections, arguing that the refusal to interview the child violated R.C. 3109.04(B)(1) as well as the child's due-process right to be heard.

{¶ 29} Upon review, we find no violation of the statute or due process. We begin with the statute. It provides:

(B)(1) When making the allocation of the parental rights and responsibilities for the care of the children *under this section* in an original proceeding or in any proceeding for modification of a prior order of the court making the allocation, *the court shall take into account that which would be in the best interest of the children. In determining the child's best interest for purposes of making its allocation of the parental rights and responsibilities for the care of the child and for purposes of resolving any issues related to the making of that allocation, the court, in its discretion, may and, upon the request of either party, shall interview in chambers any or all of the involved children* regarding their wishes and concerns with respect to the allocation.

(Emphasis added.) R.C. 3109.04(B)(1).

{¶ 30} Michal cites R.C. 3109.04(A) for the proposition that the foregoing rule applies in the context of her motion for a civil protection order. In relevant part, R.C. 3109.04(A) provides:

(A) In any divorce, legal separation, or annulment proceeding *and in any proceeding pertaining to the allocation of parental rights and responsibilities*

*for the care of a child*, upon hearing the testimony of either or both parents and considering any mediation report filed pursuant to section 3109.052 of the Revised Code and in accordance with sections 3127.01 to 3127.53 of the Revised Code [The Uniform Child Custody Jurisdiction and Enforcement Act], the court shall allocate the parental rights and responsibilities for the care of the minor children of the marriage. Subject to division (D)(2) of this section, the court may allocate the parental rights and responsibilities for the care of the children in either of the following ways:

(1) * * * allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents the other rights and responsibilities for the care of the children, including, but not limited to, the responsibility to provide support for the children and the right of the parent who is not the residential parent to have continuing contact with the children.

(2) * * * allocate the parental rights and responsibilities for the care of the children to both parents and issue a shared parenting order requiring the parents to share all or some of the aspects of the physical and legal care of the children in accordance with the approved plan for shared parenting. * * *.

{¶ 31} Michal argues that, under R.C. 3109.04(A), her petition for a protection order was a "proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child." This is so, she contends, because her petition sought a temporary

allocation of parental rights and responsibilities (Doc. #1 at 2) and because the protection-order statute, R.C. 3113.31(E)(1)(d), allows a court issuing a protection order to "[t]emporarily allocate parental rights and responsibilities for the care of, or establish temporary parenting time rights with regard to, minor children, if no other court has determined, or is determining, the allocation of parental rights and responsibilities for the minor children or parenting time rights[.]" Based on the premise that her petition came within the scope of R.C. 3109.04(A), Michal insists the trial court was obligated by R.C. 3109.04(B)(1) to grant her motion for an in camera interview.

{¶ 32} We find Michal's argument to be unpersuasive. As a threshold matter, "we must review all of R.C. 3109.04 rather than an isolated phrase to determine the legislative intent." *State ex rel. Thompson v. Spon*, 83 Ohio St.3d 551, 554, 700 N.E.2d 1281 (1998). " 'In reviewing a statute, a court cannot pick out one sentence and disassociate it from the context, but must look to the four corners of the enactment to determine the intent of the enacting body.' " *Id.*, quoting *State v. Wilson*, 77 Ohio St.3d 334, 336, 673 N.E.2d 1347 (1997). After reviewing R.C. 3109.04(A) and (B) in their entirety, we believe the requirement to interview a child in camera at the request of a party did not apply to Michal's protection-order petition.

{¶ 33} On the surface, R.C. 3109.04(A) arguably does appear to apply to Michal's petition, which tangentially "pertained" to the allocation of parental rights insofar as a trial court temporarily may allocate those rights when granting a protection order. On closer examination, however, we are convinced that R.C. 3109.04(A) and (B) do not apply. We reach this conclusion for several reasons. First, R.C. 3109.04(A) explicitly obligates a trial court to allocate parental rights in one of two ways: (1) by designating one party the

residential parent and the legal custodian, and dividing between the parties the other rights and responsibilities for the care of the children, including child-support and parenting time or (2) by entering a shared-parenting order. Both of these options are applicable to traditional divorce or related custody proceedings. They exceed the scope of the temporary allocation that occurs in the context of a protection order. Here, for example, the ex parte protection order simply awarded "temporary custody" to Michal and suspended Mahamadou's "visitation rights." (Doc. #3 at ¶ 11-12). The order did not designate Michal as the "residential parent." Nor did it proceed to divide between the parties any other rights and responsibilities including child support. It did not do so because the protection-order statute, R.C. 3113.31, does not require these determinations. Moreover, Michal's untimely death also means that the domestic relations court no longer has authority to allocate parental rights because there is only one parent remaining.

{¶ 34} Second, R.C. 3109.04(B)(1) directs a court consider "the best interest of the children" when allocating parental rights and responsibilities under that section. To assist in this statutory best-interest determination, R.C. 3109.04(B)(1) requires an in camera interview of a child at either parent's request. Notably, however, the civil protection order statute, R.C. 3113.31, *does not* "specifically require the trial court to consider the 'best interest factors' [in R.C. 3109.04(F)(1)] used for creating or modifying a shared parenting plan, or determining companionship rights." *Couch v. Harrison*, 12th Dist. Clermont No. CA2000-08-063, 2001 WL 121108, *3 (Feb. 12, 2001). "Had the legislature intended to have trial courts weigh the best interest factors in R.C. 3109.04(F)(1) before allocating parental rights and responsibilities in a civil protection order, it would have expressly so

declared." *Id.* Instead, "R.C. 3113.31 demonstrates a clear and unambiguous legislative intent to enable the trial court to immediately provide for the temporary safety and protection of minor children." *Id.* Because a trial court is not required to consider the R.C. 3109.04 best-interest factors, or even to make an explicit best-interest determination, when resolving a request for a civil protection order, R.C. 3109.04(B)(1)'s requirement for a trial court to conduct an in camera interview to determine a child's best interest does not apply.[4]

{¶ 35} Third, this court and others have recognized that a temporary allocation of parental rights in the context of a protection order does not constitute a "prior decree allocating parental rights and responsibilities" under R.C. 3109.04(E)(1)(a), which requires a change in circumstances and a best-interest determination before modifying a "prior decree." *See, e.g.*, *In re A.N.*, 2d Dist. Greene Nos. 2010 CA 83, 2011 CA 7, 2011-Ohio-2422. This is so because "a protection order 'is not regarded as a custody proceeding. Rather, * * * [i]t is only a temporary order that lasts until the issue is litigated in domestic relations or juvenile court.' " *Id.* at ¶ 12, quoting *Tabler v. Meyers*, 173 Ohio App.3d 657, 2007-Ohio-6219, 880 N.E.2d 103, ¶ 14 (7th Dist.). Although *In re A.N.* involved a different issue, it supports our determination that a temporary allocation of parental rights in a protection-order proceeding falls outside the scope of R.C. 3109.04 because such a proceeding is not a custody proceeding under that statute.

{¶ 36} Fourth, the Ohio Supreme Court in *Spon*, *supra*, expressly rejected an

---

[4] This is not to say, of course, that a child's "best interest" is not relevant in a protection-order proceeding. We are simply pointing out that, unlike R.C. 3109.04, the protection-order statute, R.C. 3113.31, does not require the explicit, statutory best-interest determination that underlies the in camera interview requirement.

argument that a reference in R.C. 3109.04(C) to the allocation of parental rights "in any proceeding" included the temporary allocation of such rights in a protection-order proceeding. The issue was important in *Spon* because the application of R.C. 3109.04(C) would have triggered a requirement for certain findings of fact and conclusions of law that were not made. After reviewing R.C. 3109.04 in its entirety, however, the Ohio Supreme Court determined that R.C. 3109.04(C)—notwithstanding its reference to "any proceeding" allocating parental rights—actually applied only to "final decrees allocating parental rights and responsibilities or subsequent modification of final decrees rather than temporary orders allocating parental rights and responsibilities." *Spon* at 554. Michal's argument is similar. She relies on R.C. 3109.04(A)'s reference to "any proceeding pertaining to the allocation of parental rights and responsibilities" to argue that R.C. 3109.04(B)(1)'s requirement for an in camera interview applied to her protection-order proceeding. In addition to our analysis above, *Spon* supports our rejection of her argument and our conclusion that R.C. 3109.04 had no applicability in the context of her petition for a protection order.

{¶ 37} We are equally unpersuaded by Michal's due-process argument. The simplest response to it is that the trial court never deprived her child of an opportunity to be heard. Based on the reasoning set forth above, the trial court had no statutory obligation, under R.C. 3109.04(B)(1), to conduct an in camera interview of the child. That does not mean, however, that the child could not testify as a witness at the hearing, provided she was competent to do so. The trial court never prohibited the child from testifying. It merely urged counsel not to call the child as a witness, pointing out that the four-year-old's competence would need to be established. (Tr. Vol. I at 171). At that point,

Michal's counsel, noting psychologist Cordell's recommendation that the child not testify, declared that he would not put the child on the stand. (*Id.*). Counsel's own decision not to call the child, even if motivated by concerns about possible psychological harm, simply does not establish a due-process deprivation.[5] Accordingly, the first assignment of error is overruled.

{¶ 38} In her second assignment of error, Michal claims the trial court erred in refusing to reopen the proceedings to address newly discovered evidence of "imminent harm." This argument concerns the motion filed one day before the magistrate's ruling. Therein, Michal invoked Civ.R. 59(A)(8), which authorizes a new trial based on newly discovered evidence, and expressed concern that Mahamadou might be planning to remove the child from the United States. In support, she provided the above-referenced affidavit from Matthew Downs, who averred that Mahamadou had requested, but not received, the child's passport.

{¶ 39} The magistrate implicitly overruled the Civ.R. 59 motion when vacating the ex parte protection order and dismissing Michal's petition. The trial court did likewise when it adopted the magistrate's decision and later overruled Michal's objections, which raised the Civ.R. 59 issue. We review the denial of a motion under Civ.R. 59 for an abuse of discretion. *In re H.Y.*, 2d Dist. Montgomery No. 26082, 2014-Ohio-2674, ¶ 18.

---

[5] We note too that Michal testified about the child's concerns and allegations, as did Cordell. "When the child's interests are aligned with a parent's, as a practical matter, the child's wishes and concerns will be advanced by that parent." *In re A.G.*, 139 Ohio St.3d 572, 2014-Ohio-2597, 13 N.E.3d 1146, ¶ 72. In *In re A.G.*, which Michal cites, the Ohio Supreme Court upheld the exclusion of a minor child from custody proceedings, over a due-process objection, noting the availability of other avenues for the child's wishes to be made known. Here, however, the trial court did not exclude the parties' minor child from the protection-order proceedings. Michal's counsel did that by making the decision not to attempt to have the child testify.

{¶ 40} We see no abuse of discretion here for at least two reasons. First, we are unconvinced that a fear of "abduction," at least under the circumstances of this case, is grounds for a domestic violence civil protection order. The pertinent statute defines "domestic violence," for purposes of a protection order, as committing one or more of the following acts against a family or household member:

(a) Attempting to cause or recklessly causing bodily injury;

(b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 [menacing by stalking] or 2911.211 [aggravated trespass] of the Revised Code;

(c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031 of the Revised Code;

(d) Committing a sexually oriented offense.

R.C. 3113.31(A)(1)(a)-(d).

{¶ 41} A fear that Mahamadou might accompany his own daughter to Africa following his wife's death does not appear to fit within any of the foregoing grounds. This is particularly true if the allegations of abuse are discounted based on the trial court's finding that they were not proven by the preponderance of the evidence (an issue we will address *infra*). In opposition to this conclusion, Michal cites *Reynolds v. Reynolds*, 2d Dist. Montgomery No. 18436, 2001 WL 62552 (Jan. 26, 2001). In that case, the trial court cited evidence of physical abuse and threats, a threat of abduction, and menacing by stalking as grounds to issue a domestic violence protection order. *Id.* at *1-*3 (quoting the trial court's opinion). On review, however, this court focused on the defendant's physical

threats and acts of violence, not the trial court's remark about abduction. *Id.* at *4.

**{¶ 42}** Second, even if abduction fears can justify a domestic violence civil protection order, it was not an abuse of discretion to refuse to reopen the proceedings in this case. Michal's protection-order petition contained no allegations concerning a fear of abduction. At the subsequent hearing, she briefly mentioned Mahamadou wanting to have the parties' child educated in Africa. (Tr. Vol. I at 79). Michal also expressed her own interest in taking a trip to Africa. (*Id.*). She then theorized that Mahamadou might take the child to Africa, engage in sexual abuse there, and then kill the child. (*Id.* at 81-82). Michal's hearing testimony provides little, if any, objective support for these concerns, particularly considering that the trial court found her sexual abuse concerns not proven. Nor does the fact that, after the hearing and after his wife's death, Mahamadou, the child's father, requested his own daughter's passport.

**{¶ 43}** With proper supporting evidence, fears of abduction might be relevant to the issuance of a domestic violence civil protection order, especially in conjunction with a finding that a defendant is engaging in acts of physical or sexual abuse that are likely to continue in the new location. On the record before us, however, we are unconvinced that the newly discovered evidence at issue—Mahamadou's request for his own daughter's passport after his wife's death—probably would have changed the result with regard to the dismissal of the petition for a protection order. Absent that showing, denial of the Civ.R. 59 motion was not an abuse of discretion. *See, e.g., Rogers v. Rogers*, 2d Dist. Miami No. 95-CA-7, 1995 WL 461262, *2 (Aug. 2, 1995) (recognizing that to succeed on a new-trial motion under Civ.R. 59(A)(8) a movant must show, inter alia, that the new evidence will probably change the result). Accordingly, the second assignment of error is

overruled.

{¶ 44} In her last remaining assignment of error, Michal challenges the trial court's dismissal of her petition and vacation of the ex parte order as being against the weight of the evidence. She advances two arguments in support. First, she contends she proved sexual abuse by the preponderance of the evidence. Second, she claims the magistrate and the trial court failed to address the abduction issue.

{¶ 45} "When assessing whether a protection order should have been issued, the reviewing court must determine whether there was sufficient credible evidence to prove by a preponderance of the evidence that the petitioner was entitled to relief." *Weismuller v. Polston*, 12th Dist. Brown No. CA2011-06-014, 2012-Ohio-1476, ¶ 19. "Under the civil manifest-weight standard, '[i]f competent, credible evidence exists to support the trial court's decision, it must be affirmed.' " *Wise v. Wise*, 2d Dist. Montgomery No. 23424, 2010-Ohio-1116, ¶ 9, quoting *Gevedon v. Ivey*, 172 Ohio App.3d 567, 2007–Ohio–2970, 876 N.E.2d 604, ¶ 60 (2d Dist.). "In a civil manifest-weight analysis, 'the court reviews the trial court's rationale and the evidence the trial court has cited in support of its decision.' " *Id*. In so doing, a reviewing court must remain mindful that evaluating evidence and assessing witness credibility are primarily functions of the trier of fact. *Weismuller* at ¶ 19.

{¶ 46} Having examined the record, we do not find that the trial court's dismissal of Michal's petition is against the weight of the evidence. The record supports a finding that Michal failed to prove her domestic-violence allegations by the preponderance of the evidence.

{¶ 47} With regard to the sexual-abuse allegations, Michal contends the magistrate and the trial court "gave undue deference" to (1) the absence of criminal

charges against Mahamadou, (2) the child's inability to describe in detail what she claimed he had done to her, and (3) psychologist Cordell's failure to gather information from Mahamadou, CARE House, or law enforcement. Although the magistrate's decision noted these facts, among others, we are unpersuaded that the magistrate or the trial court gave "undue deference" to them. The lack of criminal charges or even a civil abuse case by MCCS certainly was not dispositive. But the magistrate and the trial court were entitled to consider those facts, which were addressed during the hearing. Likewise, the child's inability to describe "in detail" what Mahamadou allegedly had done, while understandable, was a relevant consideration. We do not find that the trial court gave that fact undue deference. Nor are we persuaded that undue deference was given to the fact that Cordell did not gather information from certain entities or individuals (beyond requesting records from Care House), which was addressed on cross examination.

{¶ 48} Michal also argues that the trial court's reliance on a lack of medical evidence substantiating sexual abuse was misplaced. Once again, however, that fact, while not dispositive, remained a relevant consideration. The fact that the child's medical examination was essentially normal certainly did not rule out the possibility of sexual abuse. But the trial court was entitled to take into account the lack of corroborating medical evidence when assessing whether Michal had proven her allegations by the preponderance of the evidence. As Michal correctly points out on appeal, the fact that Cordell saw no indication of the child being "coached" also was a relevant consideration. But that fact was not dispositive either with regard to the veracity of the child's allegations or Michal's ability to prove them. Finally, Michal claims Mahamadou's contradictory and extreme statements about being, or not being, alone with the child undermined his

testimony, which the magistrate expressly found credible. We disagree. Although Mahamadou did appear to contradict himself when questioned about being alone with the child, the magistrate noted that "English is not his first language." (Doc. #26 at 3). The magistrate and the trial court reasonably could have determined that he was confused about the scope of the questions rather than dishonest. Based on our review of the record as a whole, the trial court's conclusion regarding Michal's failure to prove her sexual-abuse allegations by the preponderance of the evidence is not against the weight of the evidence.

{¶ 49} The only remaining issue is whether the trial court's ruling is against the weight of the evidence because it failed to address the abduction issue. We conclude that it is not. In our view, on this record, use of the term abduction is unnecessarily strong and unsupported. As noted above, Michal's petition for a protection order did not contain any allegations regarding threats of abduction. The issue arose during the hearing only tangentially in the context of Michal mentioning Mahamadou wanting to have the child educated in Africa, expressing her own interest in taking a trip to Africa, and speculating that Mahamadou might take the child to Africa, engage in sexual abuse there, and then kill the child. (Tr. Vol. I at 79-82). Particularly in light of Michal's failure to allege abduction concerns in her petition, we are unconvinced that this foray into abduction compelled the magistrate or the trial court to make an explicit ruling as to whether abduction concerns warranted a protection order. Mahamadou's request for his child's passport at a time when he is the child's only parent because of Michal's death is completely unlike *Reynolds v. Reynolds*, 2d Dist. Montgomery No. 18436, 2001 WL 62552, cited as support by appellant. In *Reynolds*, the petitioner's former spouse "stated that he would abduct her

daughter from her residence while she was sleeping, or from her school during the day." Mr. Reynolds came to the petitioner's parent's home "demanding his F***ing kid" and threatening to kill her family. There were several other incidents of domestic violence which also supported the *Reynolds* protection order. In any event, we have determined above that, on the record before us, the concerns raised in testimony or the speculations of Michal's family after her death did not warrant further inquiry or support the imposition of a protection order. The third assignment of error is overruled.

{¶ 50} The judgment of the Montgomery County Common Pleas Court, Domestic Relations Division, is affirmed.

. . . . . . . . . . . .

WELBAUM, J., concurs.

FROELICH, J., dissenting:

{¶ 51} I agree with the majority that the procedural circumstances of this case are unique; however, the Civil Rules provide for the trial court to rule on objections to its judgment entry adopting a magistrate's decision, and I would not find such error in this case to be harmless.

{¶ 52} How the trial court would have weighed the alleged inconsistencies in Mahamadou's testimony, the absence of criminal charges, Dr. Cordell's testimony, the child's lack of specificity, or other parts of the transcript which it never saw are unknown to us.

{¶ 53} The trial court may well have held exactly as we now have (that the temporary protection order was appropriately denied) or it may have held otherwise (finding that the temporary protection order should not have been dismissed). But our

role is to review the trial court's judgment after it reviewed the transcript and ruled on the objections; I would remand for the court to rule on the objections.

. . . . . . . . . .

Copies mailed to:

Jade K. Smarda
Mahamadou Insa
Hon. Denise L. Cross