[Cite as *B.L.L. v. M.T.*, 2021-Ohio-4300.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

B.L.L.,

Petitioner-Appellee,

v.

M.T.,

Respondent-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MA 0021**

---

Civil Appeal from the
Court of Common Pleas, Domestic Relations Division, of  Mahoning County, Ohio
Case No. 20 DV 212

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

B.L.L., *Pro Se,* 12579 Leffingwell Road, Berlin Center, Ohio 44401, Petitioner-Appellee
(No Brief Filed) and

*Atty. Rhys Cartwright-Jones,* and *Atty. Elliousa Nemer,* 42 North Phelps Street,
Youngstown, Ohio 44503, for Respondent-Appellant.

Dated: November 24, 2021

_____

**D'Apolito, J.**

{¶1}    Appellant-Respondent, M.T. appeals the judgment entry of the Mahoning County Court of Common Pleas, Domestic Relations Division, granting a domestic violence civil protection order ("DVCPO") to Appellee-Petitioner, B.L.L. pursuant to R.C. 3113.31. Appellant contends that Appellee's testimony at the hearing on the petition for DVCPO was either unworthy of credence, or, if believed, did not meet the standard of proof required for the issuance of a protective order. Appellee did not file a response brief. Because the issuance of the DVCPO at issue in this appeal turns completely on the credibility of the witnesses as assigned by the factfinder, the judgment entry of the trial court is affirmed.

## FACTS AND PROCEDURAL HISTORY

{¶2}    Appellee filed the petition for DVCPO on May 12, 2020.  At an evidentiary hearing conducted by the magistrate by videoconference on July 17, 2020, Appellee, acting pro se, testified that Appellant was her former boyfriend and that he resided with her until April 15, 2020, when she "asked him to leave, kicked him out." (9/10/20 Hrg. Tr., p. 4-5.)

{¶3}    Appellee testified that April 15, 2020 marked the last in a series of attempts to oust Appellant from her home, however, he had previously refused to leave.  She further testified that the involvement of the sheriff's department on May 12, 2020, at her request, was a motivating factor in Appellant's decision to return to the residence and collect his remaining belongings in order to vacate the premises permanently.  (*Id.* at 5.)

{¶4}    Appellee testified that Appellant frequently left threatening messages during their relationship, through voice mail and text, and, on at least one occasion, informed Appellee that she was "going to pay."  She further testified that Appellant had "held [her] down and left bruises." (*Id.*)

{¶5}    Appellee offered a series of exhibits to bolster her testimony.  The first exhibit was a January 25, 2020 voice mail message from Appellant to Appellee in which he disparaged Appellee for her failure to clean her residence prior to a birthday party for

one of her children. Appellee testified that the voice mail message "shows how [she] was spoke to [sic] on a daily basis." (*Id.* at 6.)

{¶6} In the voice mail message, Appellant states that Appellee is "disrespectful" and an "arrogant asshole." He further states that Appellee's life is in complete disarray due to her inability to plan, and that is why "everything that [she] own[s] is a piece of shit." (*Id.* at 7.) Evidently, Appellant believed that Appellee had blamed Appellant for the state of the residence, as he states, "This is not – my issue; this is your issue. (Inaudible) cleaning the house." He continues, "You're not going to treat me like this." The message concludes, "Freaking grow up and take care of your shit. That – that – that's the biggest favor, anything that anybody's done for you to tell you what I just told you. You're welcome." (*Id.* at 8.)

{¶7} Appellee also offered a copy of a text message, in which Appellant stated that he was not going to tolerate an unidentified issue, and that Appellee "would pay for it later." (*Id.* at 13.) At that point in the hearing, the magistrate briefly interrupted Appellee's testimony in order to instruct Appellant to mute the speaker on his computer, because the magistrate overheard Appellant laughing during Appellee's testimony. (*Id.* at 14.)

{¶8} Next, Appellee offered a photograph of a bruise on her arm. She testified that Appellant was angry with her in February of 2020 for "finding stuff in her closet [that] he thought was none of her business," so he "held [her] down on the bed [and yelled] at [her.]" (*Id.* at 15.)

{¶9} Appellee also offered into evidence a telephone call log, which revealed that Appellant telephoned Appellee nineteen times after she did not answer his first call. Appellee testified that Appellant was typically angry when she did not answer his calls, even when there was an innocuous explanation, *i.e.,* she was feeding the horses (the parties are horse trainers) or her phone "died." (*Id.* at 16.) Appellee testified that the telephone call log was from May, then, realizing the parties were no longer a couple in May, she changed her testimony to March. However, Appellee further testified that "[t]his was in January, in February, March, April. This was all the way up in – this was my whole relationship." (*Id.* at 17-18.)

{¶10} The final exhibit offered into evidence by Appellee was an image that was not described in the hearing testimony. It appears that the exhibit was a series of text messages following one of Appellant's unanswered telephone calls. Appellee testified, "[a]nd it was constant – it would go from 'Answer the phone,' to 'what are you doing,' to 'Are you cheating on me,' to 'you're lying, answer your phone.' Appellee explained "[t]his goes along with the phone calls about – it's just the constant mental abuse that I dealt with [sic]." (*Id.* at 20.)

{¶11} Finally, Appellee testified that she forwarded an electronic mail to the domestic relations court from Appellant's ex-wife stating that he was not living in Louisiana, but merely spent the summer visiting family there. Appellee relied on the electronic mail to establish that she did not know the location of Appellant's permanent residence, so any testimony that he was now living in Louisiana provided her no security. (*Id.* at 21.)

{¶12} At the conclusion of her direct testimony, Appellee stated that she and her then twelve-year-old daughter lived alone and lived in fear of Appellant. She further testified that it was the sheriff, who was present when Appellant collected his belongings on May 12, 2020, who encouraged Appellee to petition for a DVCPO. (*Id.* at 22.)

{¶13} On cross-examination, Appellee conceded that the January 25, 2020 voice mail message contained no threat of physical violence. (*Id.* at 24.) Appellee further conceded that she sent Appellant text messages in March of 2020, which he offered into evidence during his direct testimony, telling him that she loved him. She acknowledged the fact that she sent the affectionate messages at least one month after Appellant allegedly held her down and bruised her arm. She testified that "[h]e was very good at beating you to a pulp * * * then bringing you back up." (*Id.* at 26.) She explained that she was "responding to him [affectionately] to be in the safe zone." (*Id.* at 27.)

{¶14} Appellant testified that he moved from Ohio to Louisiana in April of 2020. (*Id.* at 37.) With respect to the alleged incident of domestic violence, he testified that he was a victim, not a perpetrator. According to Appellant, Appellee grabbed his hand and twisted it in April of 2020, causing a fracture, "two screw, three pins, a dislocated knuckle, and a torn tendon." (*Id.* at 38.)

{¶15} Appellant denied causing the bruise on Appellee's arm.  He testified that bruises are a common byproduct of working with horses, and he speculated that the bruise in the photograph was likely a work injury. He denied ever striking Appellee or any other woman.

{¶16} According to Appellant, the phone log establishing nineteen consecutive telephone calls from Appellant to Appellee reflects a series of calls he made in 2019, not 2020.  Appellant testified that he was concerned about Appellee's welfare when she did not answer his calls, and he called her mother that evening to confirm that Appellee was not in any danger.  (*Id.* at 39.)

{¶17} On the subject of the voice mail message, Appellant explained that Appellee's family members arrived at her home to celebrate her daughter's birthday and there was no place for the guests to sit. He testified that "you couldn't even get in the door. Dog crap, horse crap, boxes from moving. * * *I mean, just about as much dirt on the floor as there was in the barn." He attributed his diatribe to the "frustration of constantly having to deal with irresponsibility." (*Id.* at 40.)

{¶18} Appellant testified that the sheriff's office involvement on May 12th was at both parties' request.  He further testified that he did not say a word to Appellee on that day.  (*Id.* at 41-42.)

{¶19} Finally, Appellant explained that he laughed earlier in the hearing due to Appellee's attempt to characterize his statement that Appellant was "going to pay for it" to be a physical threat.  Appellant translated the phrase to mean that he was "done with [the] relationship." (*Id.* at 41.)

{¶20} Appellant's father, who accompanied Appellant on May 12, 2020 to collect his belongings from Appellee's residence, testified on his son's behalf at the hearing.  He confirmed that Appellant did not converse with Appellee on May 12, 2020. (*Id.* at 48.)  He also confirmed that Appellee fractured Appellant's hand, and that the injury required surgery.  (*Id.* at 48.)

{¶21} When asked if she had any additional testimony, Appellee conceded that Appellant's hand was fractured, but she claimed that it was injured when she "pushed his hand away, not in an aggressive way."  (*Id.* at 49.)  She characterized Appellant's hand injury as a "freak accident." (*Id.*).  Appellee added that Appellant attempted to trick the

sheriff's office by arriving at her residence prior to the appointed time, which infuriated the sheriff.

{¶22} The magistrate issued the DVCPO on July 24, 2020. The order reads, in pertinent part:

> On or about early February 2020 Respondent [sic] held Petitioner down on a bed, causing her to sustain a bruise on her arm. Respondent denies it but Petitioner was more credible. In the past few months Respondent [sic] has also made excessive phone calls to Petitioner, causing her to be in fear of physical harm.

(7/24/20 Order of Protection, p. 2.)

{¶23} On August 12, 2020, Appellant filed objections to the order of protection, as well as a request to supplement his objections after a transcript of the hearing was filed. On August 14, 2020, the domestic relations court granted Appellant's request to file supplemental objections and ordered Appellant to file a copy of the hearing transcript within thirty days.

{¶24} Supplemental objections were filed on October 16, 2020, however Appellant did not file a hearing transcript. In the absence of the transcript, the domestic relations court overruled Appellant's objections and supplemental objections on November 24, 2020.

{¶25} On December 11, 2020, Appellant filed a 60(B) motion to vacate the November 24th judgment entry. Appellant's counsel explained in the motion that he believed in error that the transcripts would be filed by the court reporter. The domestic relations court sustained the 60(B) motion and issued a judgment entry on the merits on March 2, 2021.

{¶26} In his objections and supplemental objections, Appellant argued that Appellee's testimony was not credible. The domestic relations court opined in the March 2, 2021 judgment entry that credibility is a determination to be made by the fact finder, and that the magistrate plainly stated that Appellee was more believable than Appellant.

{¶27} This timely appeal followed.

**LAW**

**{¶28}** A domestic relations court may issue a DVCPO pursuant to R.C. 3113.31, which is governed by the procedural framework of Civ.R. 65.1. "[W]hen granting a protection order, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence." *Felton v. Felton*, 79 Ohio St.3d 34, 42, 649 N.E.2d 672 (1997).

**{¶29}** "Domestic violence" is defined, in pertinent part, as

The occurrence of one or more of the following acts against a family or household member:

(i) Attempting to cause or recklessly causing bodily injury;

(ii) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211 [menacing by stalking] or 2911.211 [aggravated trespass] of the Revised Code;

* * *

R.C. 3113.31(A)(1)(a).

**{¶30}** R.C. 2903.211(A), captioned menacing by stalking, reads, in pertinent part: "(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person." "Pattern of conduct" is defined as two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents, or two or more actions or incidents closely related in time. R.C. 2903.211(D)(1).

**{¶31}** The appellate standard of review for a protection order depends upon the challenge asserted by the appellant. *Serdy v. Serdy*, 7th Dist. Noble No. 13 NO 400, 2013-Ohio-5532, ¶ 27. We apply an abuse of discretion standard if the challenge concerns the scope of the order. *Williams v. Hupp*, 7th Dist. No. 10MA112, 2011–Ohio–3403, ¶ 21; *Caban v. Ransome*, 7th Dist. No. 08MA36, 2009–Ohio–1034, ¶ 7. See also *McBride v. McBride*, 12th Dist. No. CA2011–0–061, 2012–Ohio–2146, ¶ 10; *Abuhamda–*

*Silman v. Silman*, 161 Ohio App.3d 541, 2005–Ohio–2836, 831 N.E.2d 453, ¶ 9 (8th Dist.). Where the appellant asserts that there was not a preponderance of competent, credible evidence to support the order, we conduct a weight of the evidence review. *Serdy, supra.*

**{¶32}** Weight of the evidence concerns "the inclination of the greater amount of credible evidence" supporting one side over the other. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 12, 17, applying *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Eastley*, 132 Ohio St.3d 32 at ¶ 12. A reversal on weight of the evidence is ordered only in exceptional circumstances. *Thompkins*, 78 Ohio St.3d at 387.

**{¶33}** To reverse on the weight of the evidence, an appellate court must find that the trier of fact clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice. *Id.* In weighing the evidence, a reviewing court must always be mindful that every reasonable presumption shall be made in favor of the finder of fact. *Eastley*, 132 Ohio St.3d 328 at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3.

**{¶34}** Moreover, it is the fact-finder who is best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses. See *Seasons Coal*, 10 Ohio St.3d at 80; *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). As a consequence, when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one should be believed. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999).

**{¶35}** Unlike other civil proceedings referred to a magistrate, which are generally governed by Civ.R. 53, proceedings for a DVCPO under R.C. 3113.31 implicate Civ.R. 65.1. Under Civ.R. 53, a trial court may "adopt or reject a magistrate's decision in whole or in part," modified or unmodified, regardless of whether objections have been made by any party. Civ.R. 53(D)(4)(b). The trial court may also hear a previously-referred matter, take additional evidence, or return a matter to a magistrate, and is explicitly authorized to

undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues. Civ.R. 53(D)(4)(d).

{¶36} The "independent review" standard is specifically intended to provide "more stringent" review than the "defect evident on the face" standard for non-objected matters. 2006 Staff Note, Civ.R. 53(D). The trial court's "role" under Civ.R. 53 is to "make its own factual determinations through an independent analysis of the issues," even up to the taking of new testimony or a rehearing of the matter. *Crosby v. McWilliam*, 2d. Dist. Montgomery No. 19856, 2003-Ohio-6063, ¶ 34 (cited with approval in the 2006 Staff Note to Civ.R. 53(D)); see Civ.R. 53(D)(4)(b).

{¶37} In contrast, Civ.R. 65.1, which became effective in 2012, provides a more streamlined procedure designed to expedite the process for obtaining an order of protection after a full hearing. *M.D. v. M.D.*, 2018-Ohio-4218, 121 N.E.3d 819, ¶ 48 (8th Dist.). It contains a set of provisions uniquely crafted for the particular statutory proceedings in R.C. 3313.31. See *Weber v. Forinash*, 6th Dist. Sandusky No. S-14-034, 2015-Ohio-3187, ¶ 30, citing 2012 Staff Note, Civ.R. 65.1; see also *M.D.* at ¶ 46-47. Significantly, the streamlined review process for magistrate decisions under Civ.R. 65.1(F) emerged out of a belief that Civ.R. 53's "independent review by the court of magistrate 'decisions' rendered after hearing, and * * * objections" was "incompatible" with the goal of expediting civil protection order proceedings. 2012 Staff Note, Civ.R. 65.1(F).

{¶38} Civ.R. 65.1 simplifies proceedings for a protection order in a few ways. First, Civ.R. 65.1(F)(3)(b) provides that civil protection orders are not "magistrate orders" as contemplated by Civ.R. 53(D), and, as a consequence, are not subject to the requirements of Civ.R. 53(D)(2) or (3). See *M.D.* at ¶ 48. The trial court's pre-objection review of a magistrate's decision is limited to "a determination that there is no error of law or other defect evident on the face of the order," after which the court may adopt, modify, or reject the order. Civ.R. 65.1(F)(3)(c)(ii) and (iii).

{¶39} Unlike Civ.R. 53, Civ.R. 65.1 "does not provide for a request for findings of fact and conclusions of law * * *" *Insa v. Insa*, 2016-Ohio-7425, 72 N.E.3d 1170, ¶ 27 (2d Dist.). Nor does Civ.R. 65.1 reference the taking of additional evidence or rehearing of the matter, which has led some of Ohio intermediate appellate courts to conclude that a

trial court proceeding under Civ.R. 65.1 is "unable to take additional evidence * * * [and] 'subject to drawing conclusions only from review of the same transcript and record' " before the appellate court. *M.D.* at ¶ 53, quoting *Insa* at ¶ 27.

**{¶40}** Finally, a party objecting to the trial court's adoption of the magistrate's order assumes an affirmative burden under Civ. R. 65.1(F)(3)(d)(iii) to demonstrate that:

- an error of law or other defect is evident on the face of the order;

- the credible evidence of record is insufficient to support the granting or denial of the protection order; or

- the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order.

## ANALYSIS

## ASSIGNMENT OF ERROR 1:

## THE TRIAL COURT ERRED IN GRANTING THE CIVIL PROTECTION ORDER TO APPELLEE.

**{¶41}** In his sole assignment of error, Appellant cites *In the matter of A.M.*, 2nd Dist. Greene No. 2009-CA-06, 2010-Ohio-948, ¶ 13, for the proposition that a trial court need not defer to the magistrate's determinations regarding witness credibility. He argues that the deference given to the magistrate's credibility determinations by the domestic relations court was unwarranted because Appellee's testimony at the hearing was either patently unbelievable or in the alternative, insufficient, if believed, to demonstrate a threat of physical harm.

**{¶42}** The Fifth and Twelfth District Courts of Appeals have observed that " 'Civ. R. 65.1(F)(3)(c)(iii) gives the court the authority to modify or reject the magistrate's order, without any restrictions on the court's ability to reach its own conclusions concerning credibility.' " *Pinkston v. White*, 12th Dist. Butler No. CA2019-06-094, 2019-Ohio-5165, ¶ 32, quoting *Bressler v. Nunemaker*, 5th Dist. Licking No. 17-CA-06, 2017-Ohio-5804, ¶ 9. In other words, the trial court is not required to give deference to the magistrate's factual findings. *Pinkston*, 12th Dist. Butler No. CA2019-06-094, 2019-Ohio-5165, ¶ 32.

Case No. 21 MA 0021

**{¶43}** But where, as here, the weight of the evidence turns almost exclusively on the credibility of the witnesses as assigned by the factfinder, the First District has recognized that the trial court "must be mindful * * * that the magistrate, as the trier of fact, 'is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented.' " *In re S.D.*, 1st Dist. Hamilton Nos. C-200045 and C-200084, 2020-Ohio-3379, ¶ 18, quoting *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16. Likewise, the Twelfth District in *Pinkson* observed that "when a trial court judge commits credibility determinations to a magistrate, the presumption that a subsequent credibility determination made by the trial court is correct is lessened." *Pinkson, supra,* at ¶ 32; see also *In re X.B.*, 10th Dist. Franklin Nos. 16AP-243 and 16AP-277, 2016-Ohio-5805, ¶ 13 (as the "actual trier of fact present during the testimony," the magistrate sat "in the better position to judge the credibility of witnesses").

**{¶44}** In *Durastanti v. Durastanti*, 1st Dist. Hamilton No. C-190655, 2020-Ohio-4687, the First District opined:

> The contrast between Civ.R. 65.1 and Civ.R. 53 is illuminating. So far as the "independent" and "stringent" review of a magistrate's findings under Civ.R. 53 is "incompatible" with the purpose of expediting civil protection order proceedings under Civ.R. 65.1, a trial court in a Civ.R. 65.1 proceeding should step lightly when discounting the magistrate's credibility determinations—particularly without additional evidence at its disposal. See *In re S.D.* at ¶ 18 (noting that the trial court "did not have the advantage of being present in the courtroom as the witnesses testified and observing the witnesses' demeanor").

*Id.* at ¶ 22.

**{¶45}** The testimony of Appellant and Appellee in this case was diametrically opposed. Accordingly, we find that the domestic relations court did not err in relying on the credibility determinations of the magistrate.

**{¶46}** Turning to Appellant's specific challenges to Appellee's testimony, Appellant first argues that his tirade regarding Appellee's failure to clean her residence prior to her daughter's birthday party contained no threat of physical harm. Next, he

argues that Appellee failed to provide any context for Appellant's text message that she would "pay," and, as a consequence, the statement should not be interpreted as a threat of physical harm. Appellant asserts the same contextual argument to the photograph of Appellee's bruised arm. Appellant writes, "Appellee does not testify how she got on the bed, or how she allegedly escaped Appellee's [sic] hold." (Brf. at p. 4.) Finally, Appellant argues that Appellee's inability to identify the date when Appellant telephoned her nineteen times in one day renders that testimony of no probative value.

{¶47} Despite Appellee's failure to provide any context regarding the injury to her arm, she testified nonetheless that Appellant physically assaulted her. Appellee further testified that she was regularly bombarded with telephone calls and text message when she did not answer Appellant's first call, and that he commonly subjected her to expletive-laden tirades.

{¶48} Further, although Appellant correctly argues that the voice mail message regarding Appellee's failure to clean her residence contains no direct threat of physical harm, we apply a totality of the circumstances test when examining a pattern of conduct. In *Masucci v. Burnbrier*, 7th Dist. Mahoning No. 14 MA 78, 2015-Ohio-4102, we opined that "[w]hen looking at a pattern of conduct, the court 'must take into consideration everything; i.e., the forcible entries, the phone calls, the thinly veiled threats, and the face-to-face meetings between the parties,' even if some of respondent's actions comprising this behavior, 'considered in isolation, might not appear to be particularly threatening.' " *Id.* at ¶ 8, citing *Tuuri v. Snyder*, 11th Dist. No.2000–G–2325, 2002 WL 818427, *3.

{¶49} Accordingly, we find that there is no evidence in the record that calls into question the domestic relations court's decision to defer to the magistrate's credibility determinations, and, further, that the issuance of the order of protection is supported by competent, credible evidence. As a consequence, Appellant's sole assignment of error is meritless and the issuance of the protective order is affirmed.


Donofrio, P.J., concurs.

Robb, J., concurs.


Case No. 21 MA 0021

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Domestic Relations Division, of Mahoning County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

**<u>NOTICE TO COUNSEL</u>**

**This document constitutes a final judgment entry.**