[Cite as *R.Y.D. v. M.M.*, 2022-Ohio-4116.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

| | | |
|---|---|---|
| [R.Y.D.] | : | |
| (on behalf of M.M.) | : | |
| | : | Appellate Case No. 2022-CA-14 |
| Petitioner-Appellant | : | |
| | : | Trial Court Case No. 2021-DV-233 |
| v. | : | |
| | : | (Appeal from Common Pleas |
| [M.M. – FATHER] | : | Court – Domestic Relations Division) |
| | : | |
| Respondent-Appellee | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of November, 2022.

. . . . . . . . . . .

BYRON K. BONAR, Atty. Reg. No. 0002602 & CARA J. WILLIAMS, Atty. Reg. No. 0085921, 20 South Limestone Street, Suite 220, Springfield, Ohio 45502
    Attorney for Petitioner-Appellant

M.M. – Father, Ohio
    Respondent-Appellee, Pro Se

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Petitioner-Appellant Mother, on behalf of her daughter, M.M., appeals from the trial court's denial of Mother's petition for a domestic violence civil protection order against M.M.'s father (Father). In considering Mother's objections to the magistrate's decision, the trial court listened to the recording of the hearing before the magistrate and specifically found M.M.'s testimony that her father had molested her to be credible and Father's testimony not to be credible. Accordingly, the trial court abused its discretion in denying the petition; the judgment of the trial court is reversed and remanded for proceedings consistent with this opinion.

{¶ 2} Mother filed her petition for a protection order on September 14, 2021. The petition stated that M.M. had disclosed to her brother that their father had sexually abused her while he thought she was sleeping. The petition further stated that no charges had been filed because of a lack in physical evidence, but that M.M. had been having nightmares was "having to see sleep specialist for meds to sleep now." The petition concluded: "Yet Judge is still wanting me to continue shared parenting!" Mother requested temporary parental rights and responsibilities for M.M. and her brother, I.M., and indicated that there was an open custody case involving the children in Miami County.

{¶ 3} An emergency hearing on the petition occurred the same day. At the hearing, Mother testified that M.M. was 14 years old and again stated that M.M. had told her son, M.M.'s brother, that Father "had been sexually abusing her while she was sleeping"; the son had told Mother about the alleged abuse in June 2021. Mother further testified that M.M. was "having to see a sleep specialist," was taking anxiety medicine, and couldn't sleep at night. Mother reported that she had filed for "full custody" and was

told that shared parenting had to continue until the order was changed, but M.M. was "begging" Mother not to let her go. Mother further testified that the issue had been "presented to the Juvenile Court," which ordered her to continue shared parenting, unsupervised.

> Q. This hearing this afternoon is only for one purpose and that's. This is something you learned about back in June and - -
>
> A. Well, I consider it an emergency because they're expecting me to drop her off this coming weekend like nothing even happened.

{¶ 4} The magistrate stated that the sole purpose of the hearing was to determine "whether there's an emergency that exists right now," noting that Mother had learned of the abuse allegation a few months earlier. Mother responded that it was an emergency because she was supposed to "drop M.M. off this coming weekend like nothing ever happened." However, the magistrate concluded that he could not enter an emergency order because Mother have an obligation under a court order (the shared parenting order), and the court that issued that order had been made aware of the allegation. The magistrate concluded that a trial would have to be help before granting a protection order, and a trial was scheduled. The magistrate advised Mother that these "are not easy cases to prove" and that "this would be an even more difficult case to prove since they've already tried once to prove it in Juvenile Court."

{¶ 5} On December 15, 2021, Mother filed a "First Trial Memorandum," in which she argued that the trial court had jurisdiction to issue a civil protection order to protect an abused child even if the court could not address custody or visitation regarding the

protected child.

{¶ 6} After Father requested two continuances, the hearing occurred on December 17, 2021. Several witnesses testified at the hearing.

{¶ 7} Andrea King, a mental health therapist and licensed social worker at Samaritan Behavioral Health, testified to her credentials and that she had been trained in interviewing abused children and had several years of experience doing so. King testified that the protocol for interviewing abused children was to ask them open-ended questions and non-leading questions to "let them tell their story." She stated that she asked M.M. non-leading and open-ended questions and did not "have any pre-conceived notions" before the interview process.

{¶ 8} King stated that, on October 1, 2021, she received a referral from the guidance counselor at M.M.'s school advising her that M.M. was present and "having a panic attack," and then M.M. "disclosed what had happened to her." She stated that M.M. and her mother then came in for "an intake"; when asked why Mother was present, King responded that she had needed input from Mother and Mother had to be there "for the intake to be completed." At the time of the hearing, King had interviewed M.M. six times, the first time being October 25, 2021. King testified that the purpose of the interviews was to assess M.M.'s needs, to diagnose, and then to form a treatment plan. She testified that the first interview lasted an hour, and the next five were between 40 and 60 minutes.

{¶ 9} King testified that M.M.'s statements were spontaneous, "very consistent," and did not vary when Mother was present and when she was not. According to King,

throughout the interview, M.M. became "extremely anxious, especially when talking about the incident that happened between her and her father." She also stated that she believed that M.M. knew the difference between the truth and a falsehood because her story "ha[d] been consistent each time that it [was] brought up in conversation."

{¶ 10} King stated that, in the first interview, M.M. "physically appeared anxious," was "very soft spoken," and was "fidgety." When asked if M.M. had a motive to fabricate, King responded, "I don't believe that she does." She testified that M.M. used terminology appropriate for a 14-year-old girl.

{¶ 11} When asked if, based upon her training and experience, she suspected that something had happened to M.M., King responded, "Yes, I believe that something did happen, yes." When King was asked what it was she believed had happened, Father's attorney objected, stating that King was "going to bolster the credibility" of M.M., and it was the court's job to assess her credibility after hearing her testimony. The magistrate responded by asking Mother's attorney if the point of the testimony was to get King to express an opinion about "whether she believed what the client told her"; Mother's attorney then suggested asking what M.M. had said first, "and then we can get into that."

{¶ 12} King then testified that M.M. had stated that, while she was in her room at her father's residence, he had come into her bedroom and laid in bed with her, touched her on the outside of her clothing as she pretended to be asleep, and then had "penetrated his fingers into her vagina" as she continued to pretend to be asleep; then he got up and got ready for work.

{¶ 13} When asked if M.M. could have dreamed the experience, King responded

that she did not believe so, "[b]ecause of how it impacted her since that event." She stated that it happened in August 2020, and that M.M. had not yet disclosed "how that made her feel emotionally." King testified that M.M. reported not wanting to have a relationship with her father and that she was uncomfortable, fearful, and anxious around him. King stated that M.M. reported having a "very trusting, good relationship" with Mother.

{¶ 14} Regarding having continued contact with Father, King testified that continued contact could be harmful to M.M. because, in her opinion, "it would impact her mental and emotional health in a negative way," because M.M. already felt extremely anxious about even having a conversation with Father. She stated that even meeting Father in a public place would impact M.M.'s mental health in a negative way.

{¶ 15} When asked if she believed M.M. was credible, King answered affirmatively. When she was asked to elaborate on how she arrived at that conclusion, Father's attorney objected to King's rendering an opinion as to the credibility of a witness who had not yet testified. The magistrate sustained the objection. Mother's attorney asked another question about whether M.M.'s "mental state indicate[d] trustworthiness," and Father's attorney objected again. Mother's attorney responded that the question called for "a description of [M.M.'s] mental state," which was within King's area of expertise. The magistrate rejected the argument, finding that counsel had not laid a foundation that King had "any particular knowledge; expertise; training; or experience that makes her an expert in the area of trustworthiness or truthfulness." Mother's attorney then asked King whether she had had any such training (in determining whether clients are trustworthy or

being truthful), and Father's attorney objected again. The exchange continued as follows:

MAGISTRATE: I'm going to let her answer that, but I think we're going to end up in the same place.

A [KING]. It's impossible to predict behavior from the children, but if there is enough evidence that is stated in a case, I would feel that they are trustworthy.

Q. Do you study factors that would indicate whether a child is truthful or not? Do you study factors that would indicate that?

A. What would those factors be?

Q. That's what I'm asking. That's my question.

A. I would have to say no.

Q. If someone molested a child, and you said that you had studied pedophiles, if someone had molested a child, how likely are they to reoffend?

A. Very high.

Q. Even if they received treatment, how likely are they to reoffend?

A. It is still high.

Q. What dangers are there if a pedophile has contact with a child?

ATTORNEY KING: Your honor, I hate to interrupt again, but may we know what this training consisted of about which the witness is testifying?

MAGISTRATE: Well, he hasn't established that, but she did testify earlier that she's had some treatment and has some knowledge about the characteristics of pedophiles, but we haven't had any testimony about what - - - she says she's studied pedophiles, but I think you need to go into that.

Q. Can you go into more details about the studies regarding pedophiles? What training and education have you received regarding that?

A. As far as specific trainings, I can't recall what the actual names of them are, but I have been to seminars and I've also done online trainings.

Q. So you are familiar with the characteristics and behavior of pedophiles, is that correct?

A. Yes.

{¶ 16} King testified that she "absolutely [would] not" recommend that a pedophile live with or have contact with a child. She was not familiar with any charges pending against Father. King testified that Mother's actions after her son told her about M.M.'s disclosure had been appropriate.

{¶ 17} On cross-examination, King acknowledged that allegations of abuse should be viewed with some suspicion when they arise in the context of a domestic relations case. King testified that she had not had any contact with Father; her training would permit her to examine Father and make a diagnosis regarding pedophilia, but she had not done so.

{¶ 18} King testified that Mother told her that there had been no physical findings

of abuse as a result of M.M.'s examination at the hospital because "too much time * * * had passed"; Mother also reported that the matter had been investigated by law enforcement "but there was not any evidence." King did not find those conclusions "persuasive," but she did not talk to any of the investigating officers. King stated that she was aware that contempt proceedings had been initiated due to Mother's failure to provide parenting time to Father.

{¶ 19} King testified that, based on Mother's and M.M.'s statements, King believed that Father was a pedophile and that M.M. should not live with or even have any contact with him, because M.M. was not comfortable with that and "expressed extreme anxiety" about even public, limited contact with Father. King noted that M.M. had not had contact with Father for "months." Although King acknowledged that she had not spoken to Father in making her "diagnosis," she felt that the information provided by M.M. and Mother was "adequate," even considering that Mother was involved in "a contentious domestic relations case" with Father.

{¶ 20} M.M. testified that she was 14, lived with her mother and two older brothers, and got mostly As and Bs in school. M.M. testified that she knew that truth is "[w]hen you're stating a fact" and a lie is "[w]hen you're dishonest." M.M. stated that if one fails to tell the truth, one gets "in trouble," and that an "oath" is "[w]hen you're swearing that you would tell the truth," which she stated she was doing.

{¶ 21} M.M. stated that she also knew the difference between dreams and reality, noting that "[r]eality is when you're awake and its real." She testified that she had asked Mother to file the petition for a protection order for her because she is "scared" of Father,

who she described as "abusive." M.M. described an incident in August 2020, when she was at Father's home with her brother, her sister, her grandparents, and Father. M.M. testified that she had been pretending to be asleep on the floor of the living room when Father "inappropriately touched" her; she described that he had touched her "private parts" with his hand, "rubbing his fingers." M.M. further testified that Father had put his fingers "in her crotch" for "about 20 minutes." M.M. stated that this could not have been a dream because she was awake. Then Father got up and got ready for work. M.M. denied that anyone had "suggested" that she tell this story and that she felt "very anxious and scared" when she repeated the story. She testified that she told her bother, I.M., about the incident months later; I.M. then told Mother about the alleged abuse, and Mother took her to Dayton Children's Hospital.

{¶ 22} M.M. expressed concern that Father would abuse her again, "[b]ecause once you do it, you will probably do it again." When asked how she had been affected by the alleged abuse, M.M. stated, "I'm very anxious and I have multiple panic attacks a day;" she was fearful of Father and had received treatment from King at school. She stated that she did not want to have contact with Father.

{¶ 23} On cross-examination, M.M. stated that in August 2020, she resided at Father's home; her grandparents, with whom she had a good relationship, also lived there, and her brother and sister "would sometimes come over." She stated that her brother I.M. was 15 years old. She acknowledged that, although the alleged abuse was traumatic for her, she did not tell her grandparents about it. There had been no prior incidents with Father. M.M. stated that her step-father had sexually abused her "a couple

years" earlier, but that there "wasn't enough evidence."

{¶ 24} M.M. stated that she had a week on/week off parenting schedule with her parents; while she was at Father's house, phones and television were not allowed a lot and they had to play outside, whereas at Mother's house, they could have their phones, watch TV, and hang out with friends. M.M. testified that her school performance was important to Father, and his rules were stricter than Mother's. M.M. stated that she preferred to be at Mother's home. She testified that she had spoken one time to two detectives from the Dayton Police Department about Father's alleged abuse. She stated there had been significant periods of time when Mother had been away, and M.M. did not like it. M.M. stated that Mother had lived in Indiana for a period of time.

{¶ 25} Mother testified that she had filed the petition for a protection order because her "kids were in fear of their father." She stated that she knew to ask an abused child "non-leading questions." Mother stated that on June 20, 2021, her son had told her that his sister had told him that Father had been touching her while she was "asleep." Mother stated that M.M. did not visit with Father after that. When asked if she had noticed anything unusual about M.M.'s behavior prior to learning of the alleged abuse, Mother replied that when the police had tried to make M.M. go to Father's prior to the disclosure, "she had a mental breakdown panic attack," was crying, shaking, and "just very distraught"; Mother did not know why at the time.

{¶ 26} Mother testified that, after she learned of the abuse, her lawyer suggested that she "wait a couple days" and see if M.M. told Mother anything, but when M.M. did not do so, Mother eventually brought it up to M.M. Mother stated that M.M. had confirmed

the truth of what I.M. had told Mother and said that she had been afraid to tell anyone. According to Mother, M.M. was crying and "very distraught and anxious" during this conversation, her tone of voice was shaky, and she was fidgeting with her hands and "very scared." Mother testified that she had asked M.M. non-leading questions about the alleged abuse, that M.M.'s statements about the incident were consistent, and that she used the terminology of a 14-year-old girl.

{¶ 27} Mother testified that M.M. did not supply details about the alleged abuse until they were at the hospital, specifically Care House. Regarding counseling, Mother stated that M.M. need counseling very much because of her panic attacks and not being able to sleep at night; she got counseling through her school. Mother also took M.M. to a sleep specialist , who put her on anxiety medication to help her sleep at night.

{¶ 28} Mother testified that she did not think that M.M. should see Father due to her fear and panic attacks and because M.M. was old enough to say who she wanted to spend time with. Mother stated that she had not discussed the issue with Father. She asked the court to allow her children to have protection orders until they were 18.

{¶ 29} On cross-examination, Mother testified that in October 2020, there had been an agreement for a one-year protection order with respect to I.M., but it did not apply to M.M. because "[t]hat's what the lawyers talked me into agreeing to." Mother admitted that, after the agreement was entered with respect to I.M, and knowing nothing about the alleged abuse of M.M. by Father, she did not return to the week on/week parenting schedule with M.M., because M.M. "refused to go without her brother." Mother testified that she had tried to get M.M. to go and had "call[ed] the cops," who told her she did not

have to make M.M. go. Mother acknowledged that M.M. had not seen Father since October 2020. Mother also testified that I.M. wanted "nothing to do with" Father.

{¶ 30} Mother testified that detectives in Dayton Police Department had investigated M.M.'s allegation but no charges had been filed. Mother also confirmed that there had been "a similar situation before" in which M.M.'s stepfather had been charged with rape, but the case "went away." With respect to residing in Indiana, Mother responded that she had had a job at the casino there, but that she Face Timed with M.M. every day and saw her every other weekend during that period. Mother had "no relationship at all" with Father at the time of the hearing.

{¶ 31} Father testified in opposition to the protection order. Father had been employed by the same company for four years. He stated that he had a criminal history, most recently for two felony burglaries out of Darke and Miami Counties, but that he had served his sentences from 2011 to 2015O and had finished his parole. He also acknowledged some prior felony forgeries for which he had served a sentence but said he had never been convicted of a sex offense.

{¶ 32} Regarding I.M., Father testified that their relationship with "great" and that, for a long time, the week on/week off shared parenting of M.M. and I.M. had worked well. According to Father, then one week he went to pick up the children from Mother, and neither child was bathed or had brushed their teeth, and they were "pretty dirty." Father stated that he "kind of got on them," about this, and then I.M. "decided to rebel" and say that he did not want to live with Father; Father immediately returned I.M. to Mother, and M.M. continued her visit with him because she "said she wanted to come home."

{¶ 33} According to Father, I.M. stayed away for about two weeks before Mother called Father and asked him to come and get I.M. because she couldn't handle him. When Father went to get I.M., law enforcement went with him and told I.M. he must go with Father because Mother was telling him to go. When Father and I.M. arrived at Father's home, they talked outside and I.M. "decided to cuss at" Father. Father stated that he had "reached back with [his] right arm and * * * smacked [I.M.] with the back of [his] hand" in the mouth. Father returned I.M. to Mother the following Sunday, and on the following Tuesday Father was arrested at his mother's house for domestic violence against I.M. The charge was dropped Wednesday morning and Father was released, but he had not seen I.M. since then, because Mother had "been fighting" with him. Father testified that he had agreed to a one-year protection order regarding I.M. because he knew he had been wrong to smack I.M. in the mouth. According to Father, his father had "definitely smacked [him] in the mouth plenty of times," so he "was wrong and * * * admitted to it and * * * took that year of punishment away from" I.M., but at the time of the hearing he wanted to "get [his] kid" back.

{¶ 34} With respect to M.M., Father testified that he had never touched her inappropriately or hurt her, but he was a strict and demanding father because he had not had one himself, and he attributed his time 'in the system' to this fact. When asked how M.M. responded to the discipline in his home, Father testified that she didn't like it or agree with it; she wanted more phone and TV time. But other than that, he also testified that M.M. was "totally fine" with "coming back and forth and the discipline." He stated that he had never hit or spanked either of the children except for the time I.M. cussed at

him.

{¶ 35} Regarding the sleeping arrangements at the home, Father testified that he and his children -- I.M., M.M., and a two-year old daughter – generally slept in a downstairs living room on the floor, where they often watched movies and the children "all fall asleep in [his] arms." He said that this sleeping arrangement had been in place "ever since their stepfather was accused of inappropriateness" with M.M. and Father "got full custody of them" from Mother; the children always wanted to sleep with him and be around him, so they all slept on "folded out blankets" on the floor in a makeshift bed in the living room.

{¶ 36} Father stated that, prior to the investigation into M.M.'s allegations, Mother "had been ordered to give" him M.M., but she hadn't done so as of April 1, 2021; on that date, they had a court date, but Mother did not show up. According to Father, that was Mother's "second no show to court for this same thing," so the judge granted him full custody of M.M. He stated that he picjed M.M. up at the Piqua police, and while "she might have cried and been distraught," she got into his car willingly and then stayed with him for a month. Father testified that he let Mother see M.M. on weekends until their court date in the middle of May for a full custody hearing; the Friday before the Monday court date, he took M.M. to Mother at the Huber Heights police station, and he had not seen M.M. since then.

{¶ 37} Father stated that on Saturday night around 10:30 p.m., he started getting texts from the mother of his other child telling him that Mother was saying that she was taking M.M. to "get a rape kit" in anticipation of pressing charges against Father for

"molesting" his daughter. This was the Saturday before the final custody hearing on Monday, "[n]ot before; not after; not when [I.M.] was told; not when [M.M.] was crying with the cops there that she could have said, hey, mom, no, he raped me, none of those times was anything said" until late Saturday right before the hearing in a desperate last attempt by Mother to keep custody of M.M.

{¶ 38} Father stated that he had been awarded "full custody" of M.M. on April 1, 2021, and then the report of abuse happened by mid-May before the court date, so "the magistrate didn't believe it and ordered a quick resolve." However, nothing had been quickly resolved; almost six months later, at the hearing in this matter, he was "very upset" because the detectives had "talked to everybody" and the "only person you have is a school guidance counselor that took an online course on a computer."

{¶ 39} Father testified that Mother had not given him visitation with M.M. as she had been ordered to do, until the judge finally told her "either you give him the daughter or else," but she still did not. According to Father, he "had to take the cops over there" with the April 1 order, but when they got to Mother's house, she "wasn't even there" and "she tried to leave, so the cops had to pull her over and bring her back" for Mother to give him M.M. At that point, M.M. "cried and made a little scene," as would be expected under the circumstances, but she was fine once they got to his house. Later that week, M.M. asked for $70 to get her nails done, and Father refused; "[t]he next day she went home and then this happened."

{¶ 40} On cross-examination, Father testified that it was not appropriate for a father to molest or rape his daughter. When asked about whether such a father should

get visitation or have contact with the child, Father said it would depend whether the claim was a lie, and he and Mother's attorney quibbled about whether it was a lie in this case. The magistrate eventually said that the record should reflect Father's refusal "to answer [an] appropriate question" and instructed the parties to move on.

{¶ 41} The magistrate denied Mother's petition for a protection order on behalf of M.M. The magistrate noted that the case arose in the context of a contested custody proceeding in the Miami County Juvenile Court and that neither party had called I.M. to testify about when M.M. had told him about the allegation of abuse, when he told Mother, or why he waited until he was at a lawyer's office with Mother in June 2021 to mention that his sister had been sexually abused ten months earlier. The magistrate also noted that, although there was testimony that the one-year protection order issued in October 2020 had pertained only to I.M., the record of that case showed that the one-year consent agreement filed on October 22, 2020, named both I.M. and M.M. as protected parties.

{¶ 42} Additionally, the magistrate found that Mother's September 2020 petition for a protection order was based on I.M. and M.M.'s report to Mother about Father's assault of I.M.; in light of that information, Mother did not think it was safe to send either child to Father. The magistrate reasoned:

> * * * Since [Mother] was allegedly attempting to protect [M.M.] from her father, it raises a question as to why [M.M.] did not tell her mother at that time that she had been abused by her father barely a month earlier. [M.M.] testified she never told her mother about the incident. In contrast, [Mother] said that she discussed it with [M.M.] a few days after [I.M.] told

her about it at the lawyer's office.

At the trial on the petition, [M.M.], now age 14, was the only witness to testify about the alleged incident. She was obviously very reluctant to talk about the incident, although her reluctance can have multiple explanations. She used the phrase "touched me inappropriately" three times when asked to explain what happened. Her affect during her testimony was flat and she did not display any outward signs of emotion in response to the questions. She also showed that she could easily be led to change her testimony when suggested there was another answer. It was also clear the allegation attributed to [M.M.] was divulged during a time of contentious custody litigation. If [Father] is correct, it was revealed on the eve of a final custody hearing and after he had previously been given temporary custody of [M.M.].

The testimony of the counselor, Andrea King, was apparently offered to corroborate that [M.M.] told King about this incident during their counseling sessions in October of 2021. King testified quite specifically that [M.M.] told her that [Father] came "into her bedroom" and that he "laid in bed with her." At the trial, [M.M.] described the location as being "in the living room" and "on the floor". King's testimony also contradicted [Mother's] in the particulars of how [M.M.] came into counseling. [Mother] testified that she called the school to ask for counseling for [M.M.]. [M.M.] and King testified [M.M.] was referred to King by the guidance counselor

because [M.M.] [was] having a panic attack at school. Also, [Mother] testified [M.M.] had been having panic attacks and trouble sleeping while she had been staying at her father[']s, but she had not seen her father since June of 2021. However, [Mother] apparently did not seek counseling for [M.M.] if she did at all, until October of 2021 when she claims she called the school for help about the panic attacks.

While the Magistrate has concerns about the testimony in support of the petition, it should not be inferred that the respondent's testimony was accepted at face value. The respondent has multiple felony convictions, including offenses of dishonesty. [Father] was argumentative, defiant and disrespectful when being cross-examined, and at one point refused to answer a question from counsel for the petitioner.

* * * While a delay in reporting an incident of this nature is not uncommon, there was never any explanation provided by [M.M.] as to why she couldn't tell her mother or her grandmother to whom she was also close. Or why she couldn't tell her mother about the alleged incident at the time when [Mother] was trying to get a protection order to keep [M.M.] and [I.M.] away from [their] father.

* * * Also, as noted, [M.M.] showed herself to be amenable to changing her testimony in response to suggestions (or testimony) from counsel. While the leading questions may have provided more accurate information, they had the perhaps unintended consequence of also

demonstrating how easily the child can be influenced by an adult.

The testimony offered in support of the petition raises many questions which preclude it from outweighing even the diminished credibility of the respondent. In this case, the magistrate is unable to find the evidence offered in support of the petition outweighs the evidence offered by the respondent. The court finds in favor of the respondent on the petition for a domestic violence civil protection order. The petition is dismissed, with prejudice.

{¶ 43} The trial court's judgment entry (attached to the magistrate's decision) stated that the court had reviewed the decision and found no error of law or other defect on the face of the magistrate's decision. The court adopted the decision and signed the entry, citing Civ.R. 65.1.

{¶ 44} Mother filed objections on January 13, 2022, along with a request to file supplemental objections once the transcript had been completed. In her objections, Mother asserted that the magistrate had erred in denying the petition for three reasons. First, she asserted that the "weight of the evidence" showed that M.M. had been raped by her father; M.M.'s conduct was consistent with being a rape victim, she was and is "deathly afraid of him," she had sought counseling and therapy for her fear, and, since she had first disclosed the rape, she had consistently maintained that she had been raped even during and after cross-examination. Second, Mother asserted that an "error of law occurred" in that King testified "forcefully" that M.M., in her opinion, should not be compelled to have further contact with Father. According to Mother, this "critical piece

of evidence" was ignored by the magistrate. Finally, citing Evid. R. 704, Mother argued that the magistrate erred in refusing to admit King's opinion as to M.M.'s truthfulness and trustworthiness solely on the basis that it embraced the ultimate issue to be decided by the trier of fact. King's attached an affidavit from King stating that King "absolutely finds [M.M.] to be credible for a number of reasons."

{¶ 45} Father responded to Mother's objections on February 7, 2022. He argued that King's testimony was properly excluded because it did not establish "any educational background in psychology or forensics or hands on experience with any former alleged rape victims." Father also asserted that there was no "independent evidence" that M.M. feared being around Father or that her panic attacks somehow verified that a rape had occurred. Father argued that Mother misinterpreted Evid.R. 704, because "[e]xpert testimony often embraces the ultimate issue if properly presented," but it does not permit one witness to testify about the credibility of another witness Finally, Father asserted that King's claim that M.M.'s reporting of the incident had been "consistent all along" was "suspect," given that the testimony at the hearing wasn't even consistent as to where the alleged rape occurred and who was in the room. Father pointed out that the magistrate noted this inconsistency in its decision.

{¶ 46} In supplemental objections filed on February 16, 2022, Mother repeated the three arguments described above; additionally, she objected to the magistrate's failure to recognize that R.C. 3113.31 is remedial in nature and failure to construe the evidence in favor of M.M.

{¶ 47} In its decision overruling Mother's objections, the trial court noted in a

footnote that its adoption of the magistrate's order on January 4, 2022, did not preclude Mother from filing objections, citing Civ.R.53(D)(4)(b) and (d). The trial court also noted that, under Civ.R. 65.1(F)(3)(d)(i), a party has 14 days to file written objections to a trial court's adoption of a protection order. However, the court pointed out that, "unlike Civ.R. 53, a party may not object to the magistrate's grant or denial of a protection order under Civ.R. 65.1,' " citing *Insa v. Insa*, 2016-Ohio-7425, 72 N.E.3d 1170, ¶ 26 (2d Dist.).

{¶ 48}  The trial court found that the magistrate had appropriately applied the law. Regarding the weight of the evidence, the court noted that Mother's argument was primarily based on whether M.M. was credible in the absence of physical evidence, a criminal charge or conviction, witnesses, or an admission to the alleged conduct. The court stated that it had reviewed the written transcript and listened to the audio recording of the hearing on the petition and that it was not required to defer to the magistrate's determinations of witness credibility. The court did not find that M.M. had been influenced by counsel or was "led" in her answers; rather, she had "responded appropriately to each question" had not simply repeated or rephrased an answer, and had not appeared to be coached on how to answer. The trial court observed that M.M. had testified in a "calm and monotone manner" and had quickly responded to questions.

{¶ 49} With respect to Father's testimony, the court found that he "lacked credibility." The court noted that he would not answer questions, "was rude, argumentative, and disrespectful of counsel." The court found that Father "expressed clear anger" and his tone was "demanding" as he testified, " 'now I'm here to get my kid.' " The court noted that, while Father asserted that M.M. had created a story because she

did not like the rules at his house, he had been "just as culpable in not having a strong relationship with his daughter." With respect to Father's testimony that M.M. had asked to get her nails done, in response to which Father had turned off her phone, the court commented that Father's "anger was obvious" on the audio recording and his behavior was "intentional," revealing "a very controlling personality." The court did not find that M.M. lacked credibility and rejected Father's argument that M.M. had a motive to lie because she did not like her father's rules. The court pointed out that M.M. "also had a history that prevented her from being completely open about the incident and finding the need to report the incident"; it was undisputed that M.M. had previously been sexually abused by her stepfather and, while that incident had been reported and investigated, "charges for rape were filed and then nothing happened."

{¶ 50} The court concluded that, although it found M.M. to be credible, her testimony alone did "not rise to the level necessary to grant the civil protection order." The court had no doubt that M.M. was having panic attacks, but it found no evidence from which to conclude that those panic attacks were the result of "inappropriate" touching by Father. The court found that there was undisputed testimony of prior sexual conduct by the stepfather that had not been taken into consideration regarding M.M.'s issues. Finally, the trial court stated that the therapist's role was to address the panic attacks, not to determine if Father had committed sexual abuse, and that a police investigation "presumably did not rise to a level of probable cause."

{¶ 51} Regarding the alleged error of the magistrate in not considering "critical evidence," i.e., King's assessment of M.M.'s truthfulness, the court found that Evid.R.

701, which governs opinion testimony by lay witness, applied. The court rejected Mother's argument that King should have been permitted to testify as to her personal observations of M.M.'s fear of her father, because "while there was personal observation, it was based on M.M.'s conclusive statement that her father had 'penetrated' her with his fingers"; King had not explored any other reason for the panic attacks or fear, and she did not speak to Father or law enforcement officers. Because King's testimony was based only on what M.M. had told her, the court concluded that King had not testified as an expert witness, and her opinions had not been admissible as lay testimony because "rather than being personal observations, they were based on the statements of M.M."

{¶ 52} Further, the court rejected Mother's arguments that King's testimony was admissible pursuant to Evid.R. 704. Noting that King was never qualified as an expert witness and that even an expert could not be permitted to testify about the veracity of a child, the court questioned how a lay witness "could testify to such opinion." The court emphasized that King's testimony was The court found that "the testimony prohibited was solely related to the truthfulness of M.M. There is no error in prohibiting tnot based on her personal observations but on what M.M. had relayed to her.

{¶ 53} As to Mother's argument with regard to R.C. 3113.31, the trial court did not disagree ith Mother that the statue was remedial in nature, but it found no evidence that the magistrate had not recognized the remedial nature of the statute. Despite its remedial nature, the petitioner (Mother) has the burden to establish by a preponderance of the evidence that the abuse occurred in order to obtain a protection order. The trial court agreed with the magistrate that this burden had not been satisfied. The court found

no error, noting that Mother had "other means" of addressing the visitation and/or custody issue.

{¶ 54} In conclusion, the court noted the following factors, which it found to be determinative: there was no medical evidence of any abuse, no criminal charges had been filed despite an investigation, the abuse was never reported by M.M. to Mother or to her grandmother, with whom M.M. had a close relationship, M.M.'s account of the incident had "very little description"; while Father was "an unlikeable person," he presented evidence that M.M. had a motive to lie (Father's strictness an discipline); M.M. agreed she preferred [Mother's] home due to the lack of rules and discipline * * *), and the incident "allegedly took place with M.M.'s brother and half-sister present." The court also concluded that, while M.M.'s hesitancy and lack of openness about the "alleged single incident" may likely be explained by the fact that her report o prior sexual abuse by her stepfather had led to a charge of rape but "then the case disappeared without an outcome," that prior incident could also explain why M.M. was having panic attacks, anxiety, and trouble sleeping. The court noted that there had been no evidence offered about the timing of the incident with the stepfather or M.M.'s emotional or psychological issues after that incident, notwithstanding a finding of probable cause for rape. NO charges had been filed against Father. Moreover, Mother stated that she had requested the protection order because M.M. was "old enough" to make her own decision about with whom she wanted to spend time.

{¶ 55} Mother appeals from the trial court's denial of a protection order on behalf of M.M.

{¶ 56} Mother asserts one assignment of error with multiple subparts, which largely mirror the arguments raised in her objections. Additionally, Mother argues that finding "that a victim was abused and then refusing to give that victim a remedy under R.C. 3113.31 because that victim is a non-marital child, denies that non-marital child due process and equal protection of the law" and that the court erred in failing to "liberally interpret" domestic relations laws as required by R.C. 1.11. Father did not file a brief.

{¶ 57} Mother argues that , insofar as the trial court found M.M.'s testimony to be credible and claimed to have applied the preponderance of the evidence standard, it erred in not granting the civil protection order. Mother also argues that King's testimony should have been admitted as expert testimony under Evid.R. 702 or lay opinion under Evid.R. 701, and the trial court abused its discretion in failing to consider this evidence. Citing R.C. 1.11, Mother further asserts that the trial court "recognized that domestic violence laws were remedial statutes but did not apply a liberal interpretation to any domestic violence law or to this proceeding," which was error.

A.

{¶ 58} Mother argues that she was held to a higher standard of proof than the preponderance of the evidence standard. She argues that, in a civil protection order case, the standard of proof "is just more likely than not," and the Ohio Supreme Court has expressly rejected the position that corroborating evidence must be presented. Citing *Felton v. Felton,* 79 Ohio St.3d 34, 679 N.E.2d 672 (1997), Mother argues that M.M.'s testimony alone, if credible, was sufficient to meet the preponderance of the evidence standard, and the trial court did find M.M. to be credible. Mother points out that therapist

King also corroborated M.M.'s testimony and that the trial court specifically found Father's testimony not to be credible. Thus, Mother asserts that there was "more than sufficient evidence" to support the issuance of a protection order and the court should have issued such an order.

B.1.

{¶ 59} Citing R.C. 3113.31(G), Mother argues that the "remedies available in R.C. 3113.31 are in addition to any other civil or criminal remedy." Noting that one of the reasons given by the trial court for the denial of the civil protection order was the potential availability of other civil remedies, she argues that the court's reasoning was "contrary to the explicit language in R.C. 3113.31(G)" and its intent. Mother asserts that M.M. had been raped and that she was reasonably fearful of her abuser and of being raped again, that civil protection orders are available to other rape victims, and that it was arbitrarily denied in this case.

B.2.

{¶ 60} Mother also asserts that interpreting R.C. 3113.31 "to deny recovery to non-marital children for a civil protection order" despite a finding that domestic violence occurred, "unlawfully discriminates against non-marital children * * *." She argues that the trial c essentially held "that every victim of domestic violence is entitled to a remedy under R.C. 3113.31 except children," because it "would deny every non-marital child the possibility of a remedy under domestic violence laws because they would have a remedy for custody or visitation." According to Mother, the trial court denied M.M., a non-marital child, "even the possibility of a remedy under R.C. 3113.31," despite "egregious" domestic

violence, by denying the petition because there was "a possibility of a remedy available through custody or visitation. She concludes that the trial court thereby unconstitutionally discriminated against a non-marital child, although the United States Supreme Court has enunciated constitutional protections for such children.

### C.1.

**{¶ 61}** Mother asserts that "at least some or all" of the evidence from M.M.'s therapist, King, should have been considered and admitted by the trial court. Mother points to King's testimony about her qualifications and experience and about working with M.M.

### C. 2.

**{¶ 62}** Mother asserts that the trial court should not have "ignored" King's testimony that M.M. should not be forced to have further contact with Father because such contact could be detrimental to M.M.'s mental health and cause her continued fear and panic attacks. She argues that King should have been treated as an expert, citing Evid.R. 702 and Ohio Adm.Code 4757-21-02, which "defines the scope of practice for a licensed social worker." Mother also cites *State v. Blanton,* 4th Dist. Adams No. 16CA1031, 2018-Ohio-1275, arguing that other courts have "recognized licensed social workers as experts in interviewing abused children and determining the truthfulness of their patients."

### C.3.

**{¶ 63}** Mother asserts that King was not precluded from opining on M.M.'s truthfulness, because a social worker "is licensed by the State of Ohio to provide therapy,"

which includes determining whether the patient is telling the truth. Mother asserts that the court cited criminal cases that prohibit a therapist from giving an opinion as to a victim's truthfulness, but those cases cited *State v. Boston,* 46 Ohio St.3d 108, 128, 545 N.E.2d 1220 (1989). According to Mother, King's testimony should not have been excluded "because of the Sixth Amendment's Confrontation Clause."

### C.4.

{¶ 64} Citing Evid. R. 701, Mother alternatively argues that King's testimony should have been considered and admitted as lay testimony, because King was "qualified to give her lay opinion as to M.M.'s fear of her father and the consistency of her story." Mother argues that one does not need to be a trained and licensed therapist "to recognize fear in a person's face."

### D.

{¶ 65} Mother argues that the trial court "did not liberally interpret domestic violence laws or this case as required by R.C. 1.11," again pointing out that R.C. 3113.31 is a "remedial statute" under R.C. 1.11. She argues that, because the object of R.C. 31113.31 is to prevent further abuse, and that the statute specifically states that the remedies provided therein are in addition to, and not in lieu of, any other available civil remedy, whether another court was considering custody and visitation issues was irrelevant to the issuance of a civil protection order. According to Mother, "[c]ustody and visitation are not the same as a civil protection order or an adequate remedy for a rape victim. A civil protection order is enforceable by the police." Mother argues that a civil protection order enforceable by the police is better suited to protecting a victim from

further domestic violence.

{¶ 66} On July 28, 2022, Mother filed a citation to additional authority, R.C. 3109.051(A); she argues that although custody was awarded in the Miami County Juvenile Court, the trial court had jurisdiction to make a finding of domestic violence and to issue a protection order for M.M.

{¶ 67} Civ.R. 65.1(F)(3)(d)(iii) provides:

A party filing objections under this division has the burden of showing that an error of law or other defect is evident on the face of the order, or that the credible evidence of record is insufficient to support the granting or denial of the protection order, or that the magistrate abused the magistrate's discretion in including or failing to include specific terms in the protection order.

{¶ 68} We have observed:

R.C. 3113.31(E)(1) authorizes a trial court to issue a CPO "to bring about the cessation of domestic violence against [ ] family or household members." To obtain a CPO, a petitioner must demonstrate by a preponderance of the evidence that the person for whom protection is sought is in danger of domestic violence. *Tyler v. Tyler*, 2d Dist. Montgomery No. 26875, 2016-Ohio-7419, ¶ 18, citing *Felton v. Felton*, 79 Ohio St.3d 34, 679 N.E.2d 672 (1997), paragraph two of the syllabus.

*K.A. v. A.V.,* 2d Dist. Champaign No. 2018-CA-12, 2018-Ohio-4144, ¶ 16.

{¶ 69} R.C. 3113.31(A)(1)(a)(iv) defines domestic violence in part as "[c]ommitting

a sexually oriented offense."

**{¶ 70}** We further noted:

To assess whether a protection order should have been issued, "the reviewing court must determine whether there was sufficient credible evidence to prove by a preponderance of the evidence that the petitioner was entitled to relief." *Insa v. Insa*, 2016-Ohio-7425, 72 N.E.3d 1170, ¶ 45 (2d Dist.), quoting *Weismuller v. Polston*, 12th Dist. Brown No. CA2011-06-014, 2012-Ohio-1476, ¶ 19. "Under the civil manifest-weight standard, '[i]f competent, credible evidence exists to support the trial court's decision, it must be affirmed.' " *Id.*, quoting *Wise v. Wise*, 2d Dist. Montgomery No. 23424, 2010-Ohio-1116, ¶ 9. To perform a civil manifest-weight analysis, the appellate court reviews the trial court's rationale and the evidence cited in support of its decision, remaining mindful of the trial court's primary role in evaluating evidence and assessing witness credibility. *Id.*

*K.A.* at ¶ 15.

**{¶ 71}** We agree with Mother's assertion that the trial court held her to a higher standard of proof than the preponderance of the evidence. The trial court found M.M. "to be credible in her testimony" and that she had not been influenced by counsel or led in her answers. The court found that she had "responded appropriately to each question" and that it did not appear that "she had to be coached on how to answer." The court found that M.M. testified in a calm manner. The court further found that Father "lacked credibility." Despite specifically finding that the victim was credible and the respondent

was not credible, the court found that M.M.'s testimony alone did "not rise to the level necessary to grant the civil protection order," pointing out that there was "undisputed testimony of prior sexual conduct by the stepfather."

{¶ 72} Based upon the foregoing, we conclude that the trial court erred when it found that there was not sufficient credible evidence to prove by a preponderance of the evidence that M.M. was in danger of domestic violence and entitled to a civil protection order. Hence, the trial court's judgment was against the manifest weight of the evidence and an abuse of discretion. M.M. was not required to establish the molestation beyond a reasonable doubt, as seems to be suggested by the trial court's noting of no criminal prosecution.

{¶ 73} Given our determination that the trial court erred in denying Mother's petition, we need not address her argument that the trial court failed to comply with the requirements of R.C. 3113.31(G). We also decline to address Mother's argument that the trial court violated M.M.'s equal protection and due process rights by treating M.M., a non-marital child, differently from marital children, because Mother raises it for the first time on appeal. "The '[f]ailure to raise at the trial court level the issue of the constitutionality of a statue or its application, which is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time appeal.' " *Trammel v. Powell*, 2d Dist. Montgomery No. 23832, 2011-Ohio-2978, ¶ 15.

{¶ 74} Regarding the admissibility of King's testimony, we note that "[t]he admission of evidence lies within the sound discretion of the trial court, and the trial court's

ruling will not be reversed absent an abuse of discretion." *Googash v. Conrad*, 2d Dist. Montgomery Nos. 20184, 20191, 2004-Ohio-5796, ¶ 16. We have stated:

> * * * To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable. *Ojalvo v. Bd. of Trustees of Ohio State Univ.*, 12 Ohio St.3d 230, 232, 466 N.E.2d 875 (1984). "It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *State v. Malloy*, 2d Dist. Clark No. 2011-CA-21, 2012-Ohio-2664, ¶ 24. A court's decision is unreasonable "if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process persuasive." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment, Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

*Wilkes v. Wilkes*, 2d Dist. Montgomery No. 29456, 2022-Ohio-3080, ¶ 11.

{¶ 75} Evid.R. 702 governs testimony by experts and provides:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the

testimony;

**(C)** The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

**{¶ 76}** Evid.R. 701 governs opinion testimony by lay witnesses and states: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

**{¶ 77}** We conclude that *Blanton,* 4th Dist. Adams No. 16CA1031, 2018-Ohio-1275*,* which recognized licensed social workers as experts in interviewing abused children and determining their truthfulness, is distinguishable.  In that case, the Fourth District determined as follows:

> Whether a victim's statements are "consistent with" a sex crime is

beyond the knowledge and experience possessed by lay persons. Ordinary citizens in their everyday affairs do not typically interview, evaluate, and analyze sex victims. *See State v. Stowers*, 81 Ohio St.3d 260, 262, 690 N.E.2d 881 (1998) (Internal quotations omitted.) ("Most jurors would not be aware, in their everyday experiences, of how sexually abused children might respond to abuse. * * * [T]he common experience of a juror may represent a less-than-adequate foundation for assessing whether a child has been sexually abused.") Colliers [a social worker] provided the jury with her professional insight to allow the jury to better assess, examine, and scrutinize [the victim] J.S.'s statements about the incident, as well as understand the overall evidence of the case and the issue of consent.

* * *

A review of the transcript reveals that Colliers is a licensed social worker at the Mayerson Center, where she regularly conducts forensic interviews of children victimized by sex crimes. She has been employed in this capacity since 2005—specifically at the Mayerson Center since 2012—and has a Master's Degree in social work from the University of Cincinnati. She estimated that, since 2005, she has conducted over 1,000 interviews of sexually-victimized children. Moreover, prior to Blanton's trial, Colliers had testified as an expert witness in Ohio on two other occasions. Given this record of specialized training and professional experience, we conclude that Colliers did not lack the requisite qualifications under Evid.R.

702(B) to render an expert opinion. *See State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶¶ 51-53 (social worker was qualified expert in forensic interviewing where witness had master's degree, interviewed over 800 children in alleged sexual abuse cases, and provided prior expert testimony).

* * * In addition to J.S.'s statements, Colliers was able to observe J.S.'s demeanor during the interview. She was also able to rely on her vast experience interviewing victims of sexual abuse. Thus, we conclude that Collier's opinion was supported by specialized information in addition to the statements made by J.S. *See State v. Coleman*, 2016-Ohio-7335, 72 N.E.3d 1086, ¶ 29 (6th Dist.) (an expert may not base his or her opinion that a child was sexually abused solely on the child's statements, but instead must analyze the statements in conjunction with the physical evidence, the expert's observations of the child's demeanor, or other indicators tending to show the presence of sexual abuse); *State v. Lawson*, 4th Dist. Highland No. 14CA5, 2015-Ohio-189, ¶ 21 ("During the interview [the expert] had the opportunity to observe the children's behavior and speech patterns. Often the physical reactions to questioning provide important clues to determining whether the conduct alluded to in statements have a basis in fact.").

* * *

While an expert witness may not testify as to the veracity of the child's statements, *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.3d 1220

(1989), syllabus, the expert may offer testimony that provides "additional support for the truth of the *facts testified to* by the [victim], or which assists the fact finder in assessing the [victim's] veracity." (Emphasis sic.) *Stowers*, 81 Ohio St.3d at 262-263, 690 N.E.2d 881. "Therefore, an expert in child sexual abuse can testify as to his or her opinion on whether the child was abused, but the expert may not testify as to the veracity of the child's statements." *Coleman* at ¶ 29.

*Blanton* at ¶ 50, 52-53, 55.

{¶ 78} King was not designated as an expert in childhood sexual abuse, and she testified that she had not studied factors that indicate whether a child is truthful. She did not have a master's degree or testify to previous experiences of being qualified to provide expert testimony. She testified that she was "informed * * * yesterday" that the conduct that M.M. alleged constituted rape and not touching. King worked in a high school setting for Samaritan Behavioral Health, and she testified that she received a referral for M.M. from the guidance department. While King is a licensed social worker, her testimony was not adduced in the context of attempting to help a jury/factfinder better understand the characteristics of child sexual abuse in general. Her testimony was limited to her interaction with M.M. and Mother, and she improperly bolstered M.M.'s credibility by stating that she found M.M. to be credible. We see no abuse of discretion in the trial court's prohibiting King's testimony as to whether M.M. was being truthful, as such a determination was for the trier of fact to make.

{¶ 79} Finally, we note that R.C. 1.11 provides: "Remedial laws and all

proceedings under them shall be liberally construed in order to promote their object and assist the parties in obtaining justice. The rule of the common law that statutes in derogation of the common law must be strictly construed has no application to remedial laws * * *." The trial court acknowledged that R.C. 3113.31 "not only addresses a particular act but is to stop *future* abuse" and that it is remedial in nature. This portion of Mother's assignment of error lacks merit.

{¶ 80} Mother's assignment of error is sustained in part and overruled in part. Having found that Mother established, by a preponderance of the evidence, that M.M. had been sexually abused by Father, an abuse of discretion in the denial of the civil protection order is demonstrated.

{¶ 81} The judgment of the trial court is reversed, and the matter is remanded for proceedings consistent with this opinion, with instructions to include appropriate conditions in the protection order.

. . . . . . . . . . . . .

TUCKER, P.J. and WELBAUM, J., concur.


Copies sent to:

Byron K. Bonar
Cara J. Williams
M.M. - Father
Hon. Stacy M. Wall